ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. Marshall E. Belager-Price, Brenda C. Belager-Price, Brian E. Price, Retha A. Price, Richard Tucker, Carolyn Tucker, Aaron D. Puckett, Jr., Leslie Puckett, and Mary Anne Narron (Narron)
 
 [1]
 
 (collectively “the Homeowners”) instituted this action in the Chancery Court of Madison County, Mississippi, which denied their petition to enforce the protective covenants of Kristen Hills Subdivision (Kristen Hills) in Madison County against Richard M. Lingle (Richard) and Naomi T. Lingle (collectively “the Lingles”).
 
 [2]
 
 The Homeowners also sought a permanent injunction against the Lingles’ construction and use of a horse barn on the Lingles’ lot in the Kristen Hills. The Homeowners alleged that the Lingles were in breach of the restrictive covenants of the neighborhood by constructing the large horse barn without first constructing the single-family residence. The Lingles filed a counterclaim asserting that the Homeowners were interfering with their right to quiet enjoyment of their property, and in response to the Homeowners’ suit, the Lingles argued that they intended to build a single-family residence on the property when their economic situation allowed them to move forward with the construction. The Lingles stated that due to the current economic situation, they had incurred some credit and financing difficulties, and they have had difficulty selling their two homes. After a trial on the merits, the chancellor, Special Judge Thomas Zebert, found that the covenant restricting the use of the lot for a single-
 
 *709
 
 family residence with appurtenances thereto was ambiguous.
 
 [3]
 
 Therefore, the chancellor found that the protective covenants did not preclude the Lingles from construction and use of the horse barn. The chancellor also found that the Lingles intended to construct a single-family residence on the land at some future, but unknown, date. The Homeowners appeal and raise four issues. However, this ease can be resolved by addressing whether: (1) the chancellor erred in finding that the protective covenant was ambiguous, or (2) the chancellor erred as a matter of law in ruling that the Lingles’ intent to use the property for a single-family residence at some unknown date in the future could justify the Lingles’ non-conforming use in the interim period of time. We find that the protective covenant is not ambiguous relating to the requirement that the lot be used for residential purposes. However, we find the chancellor correctly ruled that the covenant does not require a house to be built before an appurtenance. Accordingly, the chancellor did not err in finding that the Lingles were not in breach of the covenant because they exhibited an intent to build a single-family residence in the future. Therefore, we affirm.
 

 FACTS
 

 ¶ 2. On June 14, 2007, the Lingles purchased a lot in Kristen Hills, which encompassed approximately 9.26 acres. The Lingles’ warranty deed states in relevant part:
 

 The subject property can only be used to build and construct only one single[-]family residence and appurtenances thereto (the term “single[-]family residence as used herein shall be construed to exclude among other things, hospitals, duplex houses, apartment houses, churches and schools and to exclude commercial and professional use, except a personal office in the home).
 

 There is no dispute that the Lingles were aware of the protective covenants. Richard is an attorney, and his office prepared the warranty deed related to his property in Kristen Hills.
 

 ¶ 8. After purchasing the property, the Lingles began to construct a large horse barn and stone entranceway, and they enlarged the house pad where a house is to be built.
 
 [4]
 
 The Lingles also placed a trailer on the property. Concerned over the presence of the trailer, disgruntled homeowners of Kristen Hills contacted Narron, one of the developers of Kristen Hills, and Narron contacted the Lingles in August 2007. Narron testified that Richard was quite rude over the telephone, and he told her that he had no intention of building a home on the property. She testified that Richard told her that he had built homes before, and it was a lot of trouble. She went on to state that he said that the barn would not prohibit someone from building a house on the property in the future. Narron further testified that Richard told her that he would not move the trailer. Nevertheless, at some point after Richard’s discussion with Narron, the Lingles removed the trailer from their property, and they continued with the construction of the horse barn.
 

 ¶ 4. After the controversy arose between Narron, Lingles, and the Homeowners, the Lingles sent a letter, dated October 23, 2007, to the Homeowners, with the excep
 
 *710
 
 tion of Narron, attempting to explain their intentions. Among other things, the letter stated that the Lingles “intend[ed] to build a house on the property at some point in the future. However, due to the slump in the real estate market, [they] [could not] predict a date upon which the house [would] be built.” The letter went on to state that the Lingles owned a house in Rankin County and one in Ridgeland, neither of which the Lingles expected to be a “quick sale.” The Lingles stated that “[i]n the meantime, it [was their] intention and desire to erect [their] horse barn on the property and move a couple of horses to the property as soon as possible.” The letter also stated that the barn the Lingles intended to build was thirty-eight feet by forty-eight feet, would cost approximately $100,000, and it would not be readily visible from Gluckstadt Road. The record reflects that the Homeowners do not take issue with the appearance of the barn.
 

 ¶ 5. Although the letter from the Lingles to the Homeowners did not discuss the death of the Lingles’ seventeen-year-old son, testimony established that the Lingles had suffered the tragic and unexpected death of their son in January 2007. The Lingles had returned home to find their son dead in the home’s kitchen. As a result of that tragedy, the Lingles had moved out of their home in Rankin County, lived in an extended-stay hotel for a couple of months, and then purchased a residence in Ridgeland, Mississippi. These events transpired within six months of the time the Lingles purchased the lot in Kristen Hills. At the time of the chancellor’s opinion, the Lingles’ home in Rankin County had been on the market since 2007, and its price had been reduced by $75,000 in an effort to expedite its sale.
 

 ¶ 6. The Homeowners agree there is no problem with the Lingles having a horse barn on the Lingles’ property as long as there is a primary residence for which the barn may be an appurtenance to. Further, the Homeowners argue that the language of the protective covenants is not ambiguous. In other words, the Homeowners assert that the covenant instructs that a home must be built first or at least simultaneously with other structures in order to be in compliance. The chancellor agreed that this was one interpretation of the covenant, but he determined that it was a narrow interpretation, and that another reasonable interpretation was that the barn, or similar structure, could be appurtenant to the land. Stated specifically, the chancellor found “that reasonable minds [could] reach different conclusions to the meaning of the restriction at issue.... ” Therefore, he construed the restrictions in favor of the Lingles. Furthermore, the chancellor found the protective covenant to be ambiguous in that it did not state the order that such structures must be built.
 

 DISCUSSION
 

 I. WHETHER THE CHANCELLOR ERRED IN FINDING THE PROTECTIVE COVENANT WAS AMBIGUOUS.
 

 ¶ 7. “Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact-finder. The standard of review for questions of law is de novo.”
 
 Parkerson v. Smith,
 
 817 So.2d 529, 532 (¶ 7) (Miss.2002) (internal citations and quotations omitted). If a contract is determined to be ambiguous, it is reviewed on appeal under a substantial evidence/manifest error standard.
 
 Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.,
 
 857 So.2d 748, 752 (¶ 8) (Miss.2003) (citation omitted).
 

 
 *711
 
 ¶ 8. This Court utilizes a three-tiered approach to contract construction, and the legal purpose and intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence.
 
 One South, Inc. v. Hollowell,
 
 963 So.2d 1156, 1162 (¶ 10) (Miss.2007) (citation omitted). “First, the ‘four[-]corners’ test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement.”
 
 Id.
 
 (citation omitted).
 

 ¶ 9. Under this approach, the entire contract is examined as a whole, and particular words and phrases do not necessarily control.
 
 Pursue Energy Corp. v. Perkins,
 
 558 So.2d 349, 352 (Miss.1990) (quoting
 
 Mounger v. Pittman,
 
 235 Miss. 85, 88, 108 So.2d 565, 567 (1959)). Furthermore, the four-corners doctrine calls for construction through application of correct language usage and English definitions, and the instrument should be construed in a manner which makes sense to an intelligent layman familiar only with the basics of the English language.
 
 Id.
 
 Only if the contract is unclear or ambiguous can the court go outside the “four corners” of the contract to determine the parties’ intent.
 
 One South, Inc.,
 
 963 So.2d at 1162 (¶ 10) (citation omitted).
 

 ¶ 10. Second, if the parties’ intent is not determined from the “four-corners” approach, then the court should apply the discretionary canons of contract construction.
 
 Id.
 
 Any ambiguities in the contract must be construed against the party who drafted it.
 
 Wade v. Selby,
 
 722 So.2d 698, 701 (¶ 9) (Miss.1998) (citation omitted). Third, if a clear meaning still cannot be determined after applying the discretionary canons of contract construction, then the court can consider extrinsic or parol evidence.
 
 One South, Inc.,
 
 963 So.2d at 1162-63 (¶ 10) (citation omitted). Utilizing this framework, we discuss the chancellor’s ruling.
 

 Can a bam or outbuilding be an “appurtenance” in the absence of a residence or other primary building?
 

 ¶ 11. The Homeowners rely upon the case of
 
 Gast v. Ederer,
 
 600 So.2d 204, 207 (Miss.1992) to support their argument that the Lingles’ barn cannot be an appurtenance in compliance with the protective covenants in the absence of a single-family residence. In response, the chancellor and the Lingles state that
 
 Gast
 
 is inapplicable. The protective covenants at issue in
 
 Gast
 
 prohibited any type of outbuilding other than a single-family residence or a garage.
 
 Id.
 
 at 205. The covenant at issue in
 
 Gast
 
 read as follows:
 

 LAND USE AND BUILDING TYPE: No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one detached single[-]family dwelling not to exceed two stories in height and a private garage for not more than two cars.
 

 Id.
 
 at 207. The supreme court affirmed the chancellor’s decision to require Frederic Gast to remove the boathouse from his property because the covenant specifically stated that there was to be nothing but a family dwelling and a garage for no more than two cars.
 
 Id.
 
 at 207-08. Although the specific facts, which required Gast to remove the boathouse, were somewhat different than the case at hand,
 
 Gast
 
 still offers guidance.
 

 ¶ 12. First, we consider the relevant language of the protective covenant at issue in the instant case. It states: “The subject property can only be used to build and construct only one single[-]family residence and appurtenances thereto....” As mentioned, the chancellor determined that the Homeowners’ interpretation that an outbuilding, such as a barn, must be “ap
 
 *712
 
 purtenant to” a residence was one interpretation, but it could also be that the barn or other outbuilding was “appurtenant to” the land. Gast offered an argument quite similar to the chancellor’s interpretation of the covenant. Gast argued that “he did not violate the ‘land[-]use and building[-]type’ covenant because he erected the boathouse as a reasonable and incidental use of the neighborhood
 
 lot.” Id.
 
 at 207 (emphasis added). The supreme court stated that Gast “missed the mark, [and] ... such additional use
 
 must be incidental
 
 to some
 
 residential
 
 purpose.”
 
 Id.
 
 (emphasis added). The supreme court went on to rely on
 
 Sutherland v. Bock,
 
 688 P.2d 157, 158 (Wyo.1984), wherein the Wyoming Supreme Court upheld an injunction finding that “a separate ‘outbuilding’ could not exist on the property absent a single-family residence.”
 
 Gast,
 
 600 So.2d at 204. The supreme court quoted the Wyoming Supreme Court as follows:
 

 Clearly, the protective and restrictive covenants contemplate that a residence is to be the principal building on the premises. The residence could exist without an outbuilding, but an outbuilding cannot legally be constructed independent of a residence. Stated another way, a residence cannot be incidental [or appurtenant] to an outbuilding.
 

 Id.
 
 Just as in
 
 Gast,
 
 we find that a layman familiar only with the basics of the English language would understand the covenant to restrict the use of the Lingles’ lot to a single-family residence and appurtenances
 
 to that residence.
 

 ¶ 13. The word “thereto” is defined as: “To that, this, or it” or “In addition to that; furthermore.” The American Heritage College Dictionary 1407 (3rd ed. 1997). Given this definition, it is clear that the average person would construe the covenant at issue as follows: “The subject property can only be used to build and construct only one single[-]family residence and appurtenances
 
 [to that
 
 residence].”
 

 ¶ 14.
 
 A.A. Home Improvement Co. v. Hide-A-Way Lake Club, Inc.,
 
 393 So.2d 1333 (Miss.1981) is also analogous to the instant case. In
 
 A.A. Home Improvement,
 
 the property owner was using the lot for the purpose of creating a thoroughfare from one neighborhood to the next
 
 without
 
 building a residence.
 
 Id.
 
 at 1335. The supreme court stated that: “There is no ambiguity in the expression ‘[n]o lot shall be used for other than residential purposes.’ ”
 
 Id.
 
 at 1336. Therefore, the supreme court found the property owner to be in violation of the covenant because “[i]t [wa]s obvious that the use of [the][l]ot ...
 
 on which there [wa]s no residence
 
 as a connecting roadway to an adjoining subdivision [wa]s not in any sense a residential use or a use incidental thereto.”
 
 Id.
 
 at 1337 (emphasis added).
 

 ¶ 15. Likewise, the language that the “subject property
 
 can only be used
 
 to build and construct only one single[-]family residence and appurtenances thereto .... ” clearly notified the Lingles, or any other purchaser of property in Kristen Hills, that the lot is to be used for residential purposes, not merely for some other purpose. In order for the Lingles to be in compliance with the covenants, any structures must be related to a residence. Any other reading of the covenant implies that a purchaser can utilize the lots for temporary recreational or storage purposes or any other purpose short of some type of commercial activity. Such a reading would be a strained interpretation of the residential-subdivision covenant.
 

 ¶ 16. Are we to assume that the average layperson familiar with the English language would understand the covenant at issue to endorse the use of the property merely for a tennis court? How about a
 
 *713
 
 swimming pool? In essence, the reading that the Lingles propose supports the idea that the lot could be used to accommodate their own personal club, equestrian center, or storage facility without ever having to use it as a residence. We do not find this interpretation to reflect the intent clearly portrayed in the covenant.
 

 ¶ 17. The chancellor also found that the covenant was ambiguous in that it did not specify an order which the residence and barn should be built, and that the Lingles intended to build a home in the future. Although we do not find that the covenant is ambiguous in its requirement to build a residence, it does not state that the home must be built before a barn, fence, pool, etc. Therefore, the timing of the construction of structures is the only ambiguity. With this in mind, we consider the second issue.
 

 II. WHETHER THE CHANCELLOR ERRED AS A MATTER OF LAW IN RULING THAT THE LIN-GLES’ INTENT TO USE THE PROPERTY FOR A SINGLE-FAMILY RESIDENCE AT SOME UNKNOWN DATE IN THE FUTURE COULD JUSTIFY THE LINGLES’ NON-CONFORMING USE IN THE INTERIM.
 

 ¶ 18. It is well settled that the findings of a chancellor or a circuit court judge, sitting without a jury, will not be reversed on appeal where they are supported by substantial, credible, and reasonable evidence.
 
 Phillips v. Miss. Dep’t of Pub. Safety,
 
 978 So.2d 656, 660 (¶ 13) (Miss.2008) (citation omitted). Despite conflicting testimony between Richard and Narron, the chancellor determined that the Lingles had demonstrated the intent to build a home, and “if Petitioner Narron had desired to prohibit the construction of a horse barn before the completion of a residence, this could have easily been accomplished by drafting a clear prohibition in the restrictive covenants.” The chancellor was correct. Any ambiguities in the contract must be construed against the party who drafted it.
 
 Wade,
 
 722 So.2d at 701 (¶ 9) (citation omitted). The chancellor also considered the following evidence to support his decision not to enjoin the Lingles from building their horse barn because he found that they had the intent to eventually build a home.
 

 ¶ 19. Following a pretrial conference held on October 8, 2008, the chancellor, accompanied by the Lingles and the attorneys for the parties, went to the Lin-gles’ property to view it and the surrounding area. The chancellor found, among other things, that the Lingles had expanded the “house pad” on which a house would, or could, be located. The “house pad” had been originally created by the former property owner. Additionally, the Lingles had built a very upscale stone entrance to the property, and the chancellor stated that “[i]t [was] difficult to believe that such an expensive stone entrance would be built for just a barn.”
 

 ¶ 20. The chancellor also noted, that the horse barn the Lingles were constructing was very large and expensive. Further, the chancellor discussed the fact that the Lingles have other property which they claim a deduction each year as farm property, yet they have not done so with this property because Richard testified that he intended to use it for residential purposes. The chancellor also considered the letter the Lingles sent to the Homeowners, which stated that they did intend to build a home in the future. Finally, the chancellor considered the legitimate economic concerns that Richard testified about — namely not being able to sell his two existing homes and credit and lending issues.
 

 ¶ 21. Furthermore, we note that the time between the Lingles’ purchasing the
 
 *714
 
 property and the lawsuit is relatively short. The Lingles purchased the property on June 14, 2007, and the Homeowners filed their petition to enforce the covenant on Apxil 29, 2008, less than eleven months later. In other words, the Homeowners pursued this suit without affording the Lingles a reasonable opportunity to build a home. The record reflects that the chancellor had substantial, credible, and reasonable evidence before him in which he could determine that the Lingles’ intentions were to build a home on the property.
 

 ¶ 22. The record reflects that it was objectively reasonable for the chancellor to find that the Lingles intended to build a home when their financial situation improved. In these precarious financial times, the chancellor did not err in declining to impose a time limit in which the Lingles must complete their home and any other improvements they may add to the property, nor did he err in denying an injunction to prohibit them from using the property for their horses. As noted in the chancellor’s ruling, other property owners of the subdivision have barns and/or detached outbuildings similar to the barn the Lingles are constructing. Also, the record reflects that other property owners have horses on their property. The chancellor also stated that Narron, one of the developers of Kristen Hills, testified that developers “intended for homeowners to have horses and barns.” We see no error in the chancellor’s ruling to deny the injunction to prevent the Lingles from using the lot for their horses until they build their home.
 

 ¶ 23. This brings us to the timing aspect imbedded within the restrictive covenant at issue. It has been acknowledged by the supreme court and this Court numerous times: “We affirm where an agency or lower court reaches the right result for the wrong reason.”
 
 Falco Lime, Inc. v. Mayor and Aldermen of City of Vicksburg,
 
 836 So.2d 711, 725 (¶ 62) (Miss.2002) (citation omitted). Although we do not find the covenant ambiguous in that it requires a property owner to use the property for residential purposes, we find that the chancellor did not commit manifest error in ruling that the barn may be built and used prior to the construction of a residence or home. However, we emphasize that we do not find that the covenant at issue allows a property owner to utilize the property indefinitely without constructing a residence.
 

 ¶ 24. It is to be remembered that when “construing restrictive covenants, the question is primarily one of intention, and the fundamental rule is that the intention of the parties as shown by the agreement governs, being determined by a fair interpretation of the entire text of the covenant.”
 
 A.A. Home Imp. Co.,
 
 393 So.2d at 1336. Additionally, when ambiguity is found in a restrictive covenant the general rule is that it is shall “be construed most strongly against the party seeking to enforce the restriction.”
 
 COR Devs., LLC v. College Hill Heights Homeowners LLC,
 
 973 So.2d 273, 286 (¶ 15) (Miss.Ct.App.2008) (citing
 
 City of Gulfport v. Wilson,
 
 603 So.2d 295, 299 (Miss.1992)). We find that a fair interpretation of the agreement between the parties indicate that the lots of Kristen Hills are to be for people to reside there, not just visit. However, because the covenant is ambiguous as to when the physical residence must be built in temporal relation to any appurtenances built thereto, we hold that the residence must be built within an
 
 objectively
 
 reasonable time period after commencing construction of any appurtenances on the subject property in order to satisfy the requirements of the covenant. Therefore, we do not hold that the chancellor’s ruling
 
 *715
 
 prohibits the Homeowners of Kristen Hills, present or future, from legally revisiting this issue based upon the interpretation of the chancellor and this Court of the restrictive covenant at issue. That is to say, should an inordinate, and
 
 objectively
 
 unreasonable, amount of time lapse with no effort by the Lingles to move forward with the construction and completion of a home, the Homeowners may bring this issue to the attention of the courts once again. The facts, and therefore the issue, would be different from the case sub judi-ce.
 

 ¶ 25. For the foregoing reasons, we find that the record supports the chancellor’s determination that the Lingles intend to comply with the covenants. Accordingly, we affirm the chancellor’s ruling but hold that the restrictive covenant at issue is not ambiguous as to the requirement to build a residential home, but it is ambiguous as to the timing of the construction of that home in relation to the construction of any appurtenances to it.
 

 ¶ 26. THE JUDGMENT OF THE CHANCERY COURT OF MADISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ., ISHEE, CARLTON AND MAXWELL, JJ., CONCUR. IRVING, GRIFFIS AND BARNES, JJ., NOT PARTICIPATING.
 

 [1]
 

 . Mary Anne Narron is not a resident of Kristen Hills, but she was a general partner of Cherry Hill Plantation, Limited Partnership, which is the developer of Kristen Hills, and she joined the Homeowners' suit in that capacity. Both Narron and Richard Lingle are attorneys.
 

 [2]
 

 . Naomi Lingle was present at trial, but she did not testify. The record reflects that communications between the parties were primarily between Richard and Narron individually or between Richard and various resident homeowners.
 

 [3]
 

 . After the first two chancellors assigned to the case entered Orders of Recusal, the Mississippi Supreme Court appointed the Honorable Thomas Zebert as a Special Judge to preside over the case.
 

 [4]
 

 . Although the record does not explicitly explain what the parties meant by "house pad,” it appears that it is part of the initial preparation for a home's foundation.