# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01110-COA

**MARY O'NEILL-MARNECHECK AND PHILIP A. MARNECHECK**                    APPELLANTS

v.

**VAL'S PROPERTY DEVELOPMENT LLC**                    APPELLEE

DATE OF JUDGMENT:                    09/11/2023
TRIAL JUDGE:                    HON. RANDI PERESICH MUELLER
COURT FROM WHICH APPEALED:         HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANTS:          JOHN PAUL BARBER
                    HARRISON MAGEE SMITH
ATTORNEYS FOR APPELLEE:            MATTHEW WARD McDADE
                    OWEN REX McNALLY
                    LEWIE G. "SKIP" NEGROTTO IV
NATURE OF THE CASE:                CIVIL - REAL PROPERTY
DISPOSITION:                    AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART - 03/24/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND LASSITTER ST. PÉ, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     In 2020, Val's Property Development LLC (VPD) sued Mary and Philip Marnecheck in the Harrison County Chancery Court for violating subdivision covenants when the Marnechecks made home renovations and repairs without approval from the Architectural Control Committee. After a temporary restraining order had been issued, the Marnechecks counterclaimed that VPD had misrepresented the condition of the home to them when they purchased it in 2019. In November 2020, the chancery court transferred the case to the

Harrison County Circuit Court, where the circuit court severed the claims. The court heard testimony on the covenant-violations claim first and rendered judgment in favor of VPD. The court ordered the Marnechecks to restore their home to its condition prior to the unauthorized improvements, which had cost the Marnechecks over $80,000. The court also ordered the Marnechecks to pay VPD $220,939.19 in attorney's fees.

¶2. The Marnechecks appeal and raise the following issues: (1) whether the circuit erred in finding that they breached the covenants, (2) whether the court erred in finding VPD was entitled to pursue injunctive relief for the Marnechecks' alleged breach of the covenants, (3) whether the court erred in granting a permanent mandatory injunction, and (4) whether the court abused its discretion in awarding VPD $220,939.19 in attorney's fees and expenses. Having reviewed the record, the written and oral arguments of the parties, and relevant precedent, we affirm in part, reverse and render in part, and reverse and remand in part.

**Facts**

*VPD*

¶3. On March 5, 2007, Val Mueller, her husband Glenn Mueller, and Richard Galloway (Val's father) formed Val's Property Development LLC (VPD) for the purpose of developing property and selling homes in the Estates of Penny Lane Subdivision (Penny Lane) in Long Beach, Mississippi. Val was designated as VPD's manager. The record does not reflect how many homes were constructed in the subdivision between 2007 and 2012, but Val's and Galloway's two homes were constructed prior to the covenants.

*Covenants Creating HOA and ACC*

2

¶4.    On April 17, 2012, Val, Glenn, and Galloway signed a "Declaration of Covenants, Conditions, and Restrictions for Estates of Penny Lane Subdivisions" (covenants), and through it formed the "Estates of Penny Lane Homeowners Association, Inc." (HOA).  The covenants were filed and recorded in the office of the Chancery Clerk for Harrison County, First Judicial District.  Val also filed articles of incorporation with the Mississippi Secretary of State's office to form the HOA as a non-profit corporation.  However, the HOA adopted no by-laws, elected no formal board of directors, held no formal meetings, created no budget reports, recorded no minutes, and provided no annual reports to homeowners.

*ACC*

¶5.    Article IV, Section 1 of the covenants created an Architectural Control Committee (ACC), independent of the HOA, that was to be composed of at least three and not more than five members who would serve until they died or resigned.  That section also required that all exterior changes to any of the lots first be submitted to and approved by the ACC "as to the harmony of external design and location in relation to surrounding structures and topography."  Article IV, Section 2 named Glenn, Val, and Jim Mihalik as the three original members of the ACC.[1]  That section also provided that if the committee fell below the three-member minimum, the remaining member or members were vested with the authority to appoint additional members.  Additionally, that section stated that "the Declarant [of the covenants] shall have the authority to appoint committee members in addition to the three

---

[1]  Mihalik was the contractor who built the homes in the subdivision.  The covenants provided that the remaining members of the committee may remove him if he ceased to construct homes in the subdivision.

original members at Declarant's sole option."[2]  The "Declarant" was the company VPD, whose manager was Val.

¶6.     The covenants stated that all requests to the ACC must contain "the site plan, floor plan, exterior elevations of all pending structures or alterations, plans for materials, color schemes, lighting schemes, plans for landscaping and other details that may affect the exterior appearance of the structure." Further, Article IV, Section 1 provided that a majority vote of the committee was required for a project to be approved, but if the committee failed to approve or disapprove a proposal within thirty (30) days of submission, then approval was not required.  Article IV, Section 4 stated that review and approval of any plans was "made on the bases [sic] of aesthetic considerations only."  The ACC never adopted any standards, guidelines, or instructions for homeowners to follow other than what appeared in the covenants.[3]

¶7.     Between June 2012 and January 2019, the ACC functioned with all three original members.  Mihalik built several homes through his construction company, and purchasers could choose from several house plans offered by Mihalik that were pre-approved for construction by the ACC, or they could present their own customized plans.  In January 2019,

---

[2]  The only other entity authorized to appoint ACC members was the Board of the HOA, but only after all lots had been sold and the original members had died or resigned.

[3]  The covenants separately addressed some specific elements, such as basketball goals and recreational equipment, maintaining building condition, building setbacks, clotheslines, garbage receptacles, driveways, fences, flagpoles, antennas, satellite dishes, landscaping, mailboxes, roofs, siding, swimming pools, and wells, but nothing on porches or dormers.

Glenn Mueller resigned,[4] and a year later, in January 2020, Mihalik also resigned, leaving Val as the only remaining member of the ACC. According to both Glenn and Mihalik, during their tenure on the ACC, they only reviewed plans for new construction because no requests for additions to existing homes were made. In other words, the ACC never had to consider plans for a home improvement project prior to the Marnechecks' renovations and repairs in this case. Mihalik also testified that the ACC (usually he and Val) had met with potential homeowners to review plans and discuss any modifications.

¶8.     Val claimed that she did not fill the vacancies left by Glenn in 2019 or Mihalik in January 2020 because allegedly there were no submissions for the ACC to consider. However, the record includes an affidavit VPD submitted to support a motion in the later litigation that contradicts this claim. In the affidavit, Matthew Elias stated the ACC approved the plans for the home he built in the subdivision *in May 2020* after he met and reviewed them with Val alone.

*Marnecheck Home Purchase*

¶9.     On December 12, 2019, Philip and Mary Marnecheck, residents of Ohio, bought a home in the Penny Lane subdivision that was previously owned by Val's father and built in 2008. However, the 2012 covenants covered all lots in the subdivision, including the Marnecheck home. As required under Mississippi law, Val, as the seller of her father's home, provided the Marnechecks with a "Property Condition Disclosure Statement" (PCSD). The property had been inspected twice, and both times, the inspections noted wood rot

---

[4]  Glenn and Val separated in 2019 and divorced in 2020.

5

around the dormer that needed to be professionally assessed. However, Mary later asserted that Val had represented that the roof had been totally repaired.

¶10. Mary moved into the home while Philip primarily resided in Ohio for work. Both were licensed attorneys, and when Mary relocated, she briefly worked for Long Beach attorney Owen McNally as an independently contracted paralegal in February and March 2020. One of McNally's clients was VPD, and during her brief time with McNally, Mary said she reviewed the VPD covenants. In later litigation, Mary said that she advised McNally to revise the covenants,[5] and she testified that she became aware there was no fully constituted ACC.

*Marnecheck Porch Project*

¶11. In August 2020, the Marnechecks decided to cover their existing back deck and build a covered front porch.[6] They hired a contractor, Herbert Holder, who drew plans for the additions or modifications, which the Marnechecks submitted to the City of Long Beach. They obtained the permit required by the city on August 21, 2020, for the $27,155.37 project, and Holder began construction of this "porch project" on August 24, 2020. Prior to beginning the work, the Marnechecks did not submit any plans for approval to the ACC because Mary understood that the ACC had only one member and not the minimum of three required by the covenants.

---

[5] Mary also gave Val and McNally copies of covenants she kept from places she had lived in Ohio.

[6] Mary later testified that she had skin cancer and wanted some shelter from the sun when she would be outside watching her grandchildren during COVID-19.

6

¶12.   Seeing the construction, Val emailed Mary on August 27, 2020, from her personal email account, inquiring about the project.  Val requested drawings for the project, but she did not say that she was reaching out as the sole remaining member of the ACC.  Val ended the email stating, "I'm sure whatever improvements you are doing to the outside of the house will be beautiful! As you are quite beautiful!  Will you submit a drawing so I can have a look?"  Believing that Val had reached out as a friend or neighbor, Mary responded that same day, telling Val that they were creating a front porch and that the drawings had been done by her builder.  When Val asked for a copy, Mary complied, sending photographs of the plans and adding, "Let me know if you need more."

¶13.   On August 28, 2020, McNally, stating that he was acting on behalf of the "Penny Lane HOA," emailed Mary and told her that the "current construction is unauthorized and must cease until you obtain approval of the Penny Lane HOA Architectural Committee."  Within two hours, Mary responded and asked who the current members of the committee were.  She also sent McNally the same photographs of the plans that she had previously sent to Val, along with a detailed description of the front porch addition, stating:

1.   The porch is off the front of the left side of the house.  There are no surrounding structures being built.
2.   The plans consist of a porch with no additional exterior structures being constructed or altered
3.   Plans for material are cement, wood, vinyl trim and roof
4.   The color scheme - gray cement, white trim, and roof
5.   There are no lighting scheme or other details affecting the exterior appearance of the structure
6.   No plans exist for landscaping and grading [because] they are not needed with the patio
7.   I do not know what needs to be done to comply with the Covenants.  There is nothing that tells me what a porch should be like[.]

7

¶14. As previously noted, the covenant provision required submission of "the site plan, floor plan, exterior elevations of all pending structures or alterations, plans for materials, color schemes, lighting schemes, plans for landscaping and other details that may affect the exterior appearance of the structure." By August 28, 2020, Mary had provided most of what the covenants required, namely, a site plan (Holder's drawings are titled "Site Plan"), which included an aerial view of the home showing where the front and back porch were located (i.e. the "floor plan"), the list of materials (cement, wood, vinyl trim, and roof), and the colors (gray and white). Mary stated there were no lighting or landscaping plans because they were not needed for the project. All that was needed was an "exterior elevation," i.e., something showing what the porch would look like when finished.

¶15. On August 29, 2020, Val emailed Mary informing her that either she or her attorney, McNally, could accept the plans, and she offered to come pick up the plans herself. Mary emailed in response, "Val, it's a porch," and there were no guidelines in the covenants for a porch. Further, Mary, who is also a nurse practitioner, stated:

> There are a lot of things that I need to do and I am working a lot of 12 hr days at the hospital so I'm hoping [because] it's not a building, garage, pool etc that ARE referenced in the bylaws needing approval from who ever is on the HOA architectural committee. . . . Nowhere does it state that it would be one person [because] the covenants state "committee"[;] we should have bylaws and covenants that are clearer.

Two days later, on August 31, 2020, Mary added that the porch she was building was very much like Val's own porch.[7]

---

[7] Val's home was also built before the covenants were established, and photographs of Val's home and the Marnechecks' home show they were built with similar materials—red brick with white trim—in a similar ranch style.

¶16. On September 2, 2020, McNally emailed Mary a response to her previous question about the members of the ACC and told her that the current members were Glenn Mueller, Valerie Mueller, and Richard Galloway, which was incorrect because the only ACC member at the time was Val. McNally also told Mary that the porch construction violated the covenants and that she needed to cease further action until the plans were approved. He said the plans were not complete because there was no information about external elevations and that the plans submitted were not legible. However, he added that "the quality and form used to submit [the plans] to the City of Long Beach should prove acceptable."

¶17. The following day, September 3, 2020, Mary hand-delivered to Val's home the site plan, foundation plan, and other related details about the project, including exactly what she had submitted to the city. During later litigation, these papers were referred to as the "Mail Box Drop." Accompanying these materials was a note from Mary, telling Val that Glenn had stopped by and never said a word about the construction, which one would think he would if he was on the ACC. Further, Mary stated that "it cannot be a party of one deciding what 'aesthetically' fits into the neighborhood."

¶18. On September 4, 2020, Val confirmed receipt of Mary's submission; however, she took no action to add members to the ACC and review with them the materials Mary had submitted. Hearing nothing further, on September 9, 2020, Mary emailed both Val and McNally an updated picture of the front porch showing its elevation, completing the requirements and curing the deficiencies McNally had cited on September 2. Mary also noted that she had asked both of them to visit the home, but neither had taken her up on the

9

offer.

¶19. McNally responded by email that same day, September 9, 2020, stating that the plans Mary provided were not acceptable, but he gave no explanation of what was wrong with them or who made that decision. McNally said that Mary may have to hire an architect to prepare additional drawings of the proposed additions and a sketch/layout of the proposed landscaping. He also inquired if she had moved a crepe myrtle tree from common-area property. Mary immediately replied that the tree she moved was on her property and that she had provided whatever project plans she had.

*Chancery Court Proceedings*

¶20. On September 29, 2020, VPD filed a "Petition for Injunctive Relief" against the Marnechecks in the Harrison County Chancery Court. The petition alleged that the Marnechecks had actual notice of the covenants, which they willfully breached by not obtaining approval from the ACC before beginning the porch project. However, VPD failed to tell the court that the Marnechecks had submitted some material or that there was no properly constituted ACC in place to review the submission or approve or disapprove plans. VPD requested a declaratory judgment that the Marnechecks had willfully violated the covenants and willfully trespassed onto a lot owned by VPD. In its pleading, VPD stated that its counsel "will send notice by email to Mary Marnecheck that this suit had been filed and a temporary restraining order requested to enjoin the Defendant's acts." VPD filed a separate motion for preliminary injunction as well, alleging the same conduct by the Marnechecks and further alleging that the Marnechecks would not be harmed by the issuance of a preliminary

10

injunction; whereas, the damages suffered by VPD would be irreparable, and VPD was likely to succeed on the merits.

¶21.    McNally emailed Mary at 10:13 p.m. on Tuesday, September 29, 2020, telling her that VPD had filed suit and was seeking a temporary restraining order, attaching the complaint. He stated that a hearing on the TRO could occur as early as Thursday at 9:00 a.m., depending on whether he could appear due to a previously scheduled shoulder surgery.  McNally said, "I will inform you as I know."

*Temporary Restraining Order (TRO)*

¶22.    McNally "let Mary know" on Thursday, October 1, 2020, with an email at 8:43 a.m. telling her that he was headed to the courthouse in Gulfport to request the TRO.  Mary did not appear, and at 9:20 a.m., the court granted the restraining order, which restrained the Marnechecks from continuing or beginning any new projects on their lot.  At 11:01 a.m., McNally emailed Mary a copy of the TRO, which was binding for ten days and restrained the Marnechecks from (1) trespassing upon Lot 4, (2) continuing the construction project, (3) starting any new construction project, (4) storing equipment or materials on their lot that are visible from any adjacent roads, or (5) removing or damaging trees and landscaping in the common areas of Lot 2.  However, the TRO did not set a date for a hearing on a preliminary injunction.

¶23.    Although McNally emailed Mary the TRO on October 1, 2020, Mary later testified that due to her long hours of work at the hospital, she did not check her email until October 10, 2020, when she found the TRO.  However, in the meantime, the Marnechecks had

11

covered and painted the porch posts, believing that they could proceed because thirty days had passed since they made their submission on September 3, 2020.

*Extension of the TRO*

¶24.    On October 7, 2020, McNally filed a motion to extend the TRO, met with the court with no notice to the Marnechecks, and obtained an order extending the TRO to October 21, 2020.

¶25.    Mary was finally served on October 16, 2020, and counsel for the Marnechecks entered his appearance that same day.  On October 19, 2020, the Marnechecks filed a motion for a continuance of the TRO hearing set for the next day because their attorney had a previously scheduled court appearance set for the same time.  They also filed a motion to quash or set aside the TRO as well as the order extending the TRO on the basis of improper notice.  However, they ultimately agreed to extend the TRO through November 14, 2020, and to continue the preliminary injunction hearing to November 13, 2020.

*Hurricane Zeta*

¶26.    On October 28, 2020, Hurricane Zeta hit the Mississippi Gulf Coast, causing damage to the Marnechecks' roof and existing fence.  Litigation between the parties on the porch project continued while the Marnechecks dealt with additional repairs that were needed due to hurricane damage.

*VPD's Resolutions Appointing Additional ACC Members and ACC Meeting*

¶27.    As noted earlier, under the covenants, Val, as the remaining member of the ACC, had the authority to fill committee vacancies at any time.  Prior to the injunction hearing, on

12

November 6, 2020, Val added two people to the committee, but not in her capacity as an ACC member; instead, she acted in her capacity as the manager of VPD (the declarant of the covenants). Val appointed her daughter, Merrin Mueller, who lived in Long Beach, and Jennifer Glass, a subdivision resident, as members of the ACC.[8] On that same day, this newly constituted ACC met via Zoom and reviewed the plans the Marnechecks submitted for the porch project. The Marnechecks were given no notice of this meeting or any opportunity to meet with the committee before it made its decision. Not surprisingly, in a resolution, the ACC found that the plans were incomplete, that the additions were inferior in design and material, and that the plans conflicted with the design of the original home and other homes in the subdivision. The committee objected to "unapproved tropical landscaping," to the vinyl siding used to cover the chimney, and to the metal roof on the porch, which they said was prohibited by Article VI, Section 25, which provided: "Roof. All fiberglass shingle roofs shall be architectural thick butted shingles. However, this shall not preclude other types of roofs which may be approved by the Architectural Control Committee." The committee concluded that the additions would negatively impact the value of the other homes in the subdivision. The ACC determined that the additions should be removed and that the property should be restored to its previous condition. Although signed by each member of the ACC on November 8 and November 9, 2020, the Marnechecks did not receive a copy of the resolution until November 13, 2020, when all parties appeared in

---

[8] In a subsequent hearing, Val claimed that she had been in contact with two architects to join the ACC when the Marnechecks made a proper submission. Curiously, neither the subdivision resident nor Val's daughter was an architect.

13

court for the preliminary injunction hearing.

*Pre-hearing Motion and Counterclaim Filed by the Marnechecks*

¶28.    Prior to the hearing, on November 12, 2020, the Marnechecks filed three pleadings: a motion to join the HOA as a necessary party pursuant to Rule 19(a)(1) of the Mississippi Rules of Civil Procedure, a counterclaim against VPD alleging that VPD misrepresented the condition of the home the Marnechecks purchased in 2019,[9] and a motion to dismiss VPD's covenants-violation action, claiming that the chancery court no longer had subject matter jurisdiction because their counterclaim against VPD alleged negligence and other tort claims.

*November 13, 2020 Hearing*

¶29.    At the preliminary injunction hearing on November 13, 2020, the chancery court considered several pending motions, including the Marnecheck's motions to quash the TRO and motion to dismiss for lack of jurisdiction.  Ruling from the bench, the chancery court denied the motion to quash, but the court found that it lacked jurisdiction over the counterclaim and transferred the entire case to the Circuit Court of Harrison County. However, the chancery court continued the TRO "until further court order."  At the close of the hearing, the Marnechecks raised the repairs they needed to make because of the hurricane.  The chancellor commented that he no longer had jurisdiction, but he encouraged

---

[9] The Marnechecks claimed that per the "Property Condition Disclosure Statement" (PCDS) Val gave them, she represented that the dishwasher and microwave were replaced in 2018, and that no portion of the roof had been repaired or replaced.  However, after purchasing the property, the Marnechecks had to replace the microwave, which they learned was a 2012 model, and the dishwasher.  The Marnechecks also discovered that the roof had been repaired, and the repairs caused leaks.  The Marnechecks retained Felix Bertucci as an expert builder to testify about the roof damage and Val's failure to disclose the water intrusion in the attic.

the parties to discuss the issue. VPD also gave the Marnechecks a copy of the ACC's resolution retroactively disapproving their porch project.

*Marnechecks' Dormer and Fence Repair*

¶30. After the November 13, 2020 hearing, VPD's counsel communicated to the Marnechecks' attorney that any repairs needed as a result of the hurricane did not need ACC approval if the Marnechecks restored the home to its pre-hurricane condition and did not change the exterior of the home. But any other changes would have to be submitted and approved.

¶31. One of the repairs needed was to fences on both sides of the Marnechecks' home. Mary emailed Val on November 21, 2020, asking if replacing the fence with a more sturdy fence required approval. She added that this was her second request and that she needed to get it done soon to keep her dogs in the yard. In response, on November 24, 2020, McNally emailed the Marnechecks' attorney that if they replaced the fence with the same fence (style, size, location, color, and material), then no approval was needed. But any other changes had to be submitted and approved. After this email, the Marnechecks submitted all further information on the project through their attorney.

¶32. The roof also needed repair, which required the removal of a dormer just above the entrance way because of leaks and rotten wood.[10] The Marnechecks hired contractor John Ruble to repair the hurricane damage. On December 23, 2020, Ruble began removing the roof and the dormer, which had completely rotted out and compromised the rafters and

---

[10] Bertucci, who had inspected the home to substantiate the counterclaim issues, confirmed the leaks and wood rot around the dormer.

beams in the attic. This left a gaping hole in the roof, which Ruble covered with a blue tarp.

*Submission of Roof and Fence Plans*

¶33. On December 31, 2020, the Marnechecks' attorney emailed McNally concerning the repairs needed to the fence and dormer. He attached plans for the fence, stating that the intent was to replace it as it was but without paint or stain at this time, and he attached a photo of what the fence would look like. Concerning the dormer, the attorney stated that the home had sustained water damage from a previous improper installation of the dormer. The attorney attached a summary from the contractor, indicating that the entire roof needed to be replaced, but adding that "the dormer and all the damaged rotten wood must first be removed." The attorney said that an architect, George Reed, was preparing a drawing for the replacement dormer. The contractor also indicated that the color of the shingles to be used was "as close to the same color as currently there." The attorney indicated that so much rotten wood in the attic created a safety issue and that "emergency repairs are underway."

¶34. McNally responded by email on January 4, 2021, saying that he did not represent the HOA nor the ACC, but he said he would pass the information on to the ACC members. McNally said that he appreciated the Marnechecks' position that the repairs were urgent, but the attorney's "notice" email came days after construction began and long after the lawsuit was filed.

¶35. Reed was not available to design the dormer, and Mary and the contractor felt that it would be reasonable to fashion one after the dormer Val had on her roof (in a more traditional, rectangular shape rather than a rounded stone dormer), and the contractor drew

a sketch.[11]  On January 5, 2021, the contractor sent the Marnechecks the design and a list of materials, paint and shingle colors, as well as the total cost of the project, $59,240.00.[12] Mary forwarded this information, including the design of the dormer, to her attorney, but it was later learned that he did not forward the dormer design to the ACC.

¶36.    Between January and March 2021, Mary was diagnosed with breast cancer and traveled to Texas for three surgeries.  Because of this, she was uncertain of what was done day by day on this project.

*ACC's Rejection of the Marnechecks' Dormer/Fence Plans*

¶37.    On January 28, 2021, the ACC met via Zoom and passed a resolution finding that the submission on the dormer and fence project was incomplete and misleading because the Marnechecks had said one thing but done another.  There was no survey marking the location of the proposed fencing, and the committee refused the Marnechecks' request to increase the fence height from four to six feet, giving no reason why when there was no fence-height limitation in the Covenants.    The committee denied the dormer plan because the Marnechecks had not submitted the design and removed the prior round metal and stone dormer, replacing it with a square-shaped vinyl-sided dormer.[13]  The committee also denied

_____

[11] It should be remembered that both Val's home and her father's home that the Marnechecks purchased were built before any other home in the subdivision.  The Marnecheck home was more similar in design and construction to Val's than to other homes constructed after the subdivision was created.

[12] It was anticipated that insurance might pay $31,927, leaving the Marnechecks to cover $27,313 of the cost.

[13] In the covenants, vinyl was allowed on fascia and trim only; but Mary later testified that the siding on the dormer was "Hardie board," which is made from fiber cement,

17

the requested change in shingle color (from charcoal black to reddish brown), again without giving a reason. The committee ordered the Marnechecks, who had started on the fence, dormer, and shingle repair, to remove what they had done and redo the work with approved materials according to approved specifications. Again, the ACC gave the Marnechecks no notice that they were reviewing the submission, nor did the committee meet with the Marnechecks at any time to discuss the projects. The actual resolution of the committee was not reviewed and approved by each member until January 31, 2021. The record does not reflect when or if the Marnechecks or their counsel were sent the ACC resolution rejecting the dormer/fence project.[14]

*Circuit Court Proceedings*

¶38. After the case was transferred to circuit court, the attorneys for the parties filed numerous motions and responses.[15] These reflected the deterioration of the relationship

---

not vinyl.

[14] There is no email or other evidence that the resolution rejecting the dormer/fence project was sent to either the Marnechecks or their attorney. The January 31, 2021 resolution first appears in the record as an attachment to a Petition for Contempt that VPD filed on March 3, 2021.

[15] Other motions included:
* VPD's motion for partial summary judgment on the covenant violations issue, filed on February 26, 2021,
* VPD's motion for summary judgment on the Marnechecks' counterclaim, filed on March 1, 2021,
* VPD's petition for contempt against the Marnechecks for violating the TRO in their construction of the dormer and fence project, filed on March 3, 2021,
* VPD's motion for sanctions, claiming that the Marnechecks' counterclaim was frivolous and filed in bad faith, warranting the award of attorney's fees and costs, filed on August 1, 2022,

between the parties and VPD's constant scrutiny of the Marnechecks' actions. For example, on December 23, 2020, VPD filed a second motion for a TRO, alleging that Mary was claiming ownership over a common area where wiring for VPD's Christmas Light Show was located and that Mary had threatened to unplug and move the wires and lights.[16] On March 3, 2021, VPD filed a supplemental motion for contempt of the chancery court's TRO, alleging, among other things, that the Marnechecks had placed items in their backyard (e.g., removable pergolas and paving stones around the air conditioner) without permission. In that pleading, VPD alleged that Mary was allowing her dogs to run loose in violation of the covenants, despite Mary's earlier request for approval of the fence so she could contain her dogs. On October 20, 2021, VPD filed a third motion for a TRO for the Marnechecks' alleged recent alterations of two exterior windows without the approval of the ACC. In the hearing on this, Mary explained that the windows themselves were not changed; they were only repaired because they would not open, and the glass was replaced where needed. She explained that the plastic mullions that made the windows appear to have four panes were not replaced. In a fourth motion for a TRO, filed in December 2021, VPD claimed that Mary was again threatening to unplug the Christmas lights, that the Marnechecks' dogs were allowed to run loose, that the Marnechecks stored construction material on their lot visible

---

\* Mutual motions to compel discovery responses,
\* VPD's motion to quash a subpoena issued to the HOA,
\* The Marnechecks' motion to join the HOA as a party, and
\* The Marnechecks' motion to amend their answer.

[16] After the motion was filed, inclement weather caused the light show to be postponed.

from the road, that they left garbage and recycled cans visible from the road, and that the yard was "in a messy state . . . due to boxes and other rubbish being left in the front." In a motion for a declaratory judgment, VPD argued it was entitled to attorney's fees under the covenants.[17]

¶39. The court heard arguments on several of these motions, during which VPD withdrew its claim that the color of the shingles in the roofing project violated the covenants. VPD also conceded that the projects completed by the Marnechecks did not affect the value of the other properties in the neighborhood.

*Motion to Sever*

¶40. On July 14, 2021, VPD filed an amended motion to advance its preliminary injunction for trial on the merits and sever the Marnechecks' counterclaims. VPD alleged that the Marnechecks' home-purchase counterclaim did not share a common nexus of facts with the covenant-violations claims, and VPD requested that the claims *either be severed* under Rule 21 *or bifurcated* under Rule 42(b) of the Mississippi Rules of Civil Procedure. VPD also waived its right to a trial by jury. On September 14, 2021, at a hearing on this motion and others, there was no argument on the motion to sever the counterclaim.[18] On October 21,

---

[17] The covenants provided that:

> In the event of any successful injunction and/or removal order, whether in whole or in part, the owner shall pay all attorney fees, legal fees, court costs and expenses of the committee in enforcing these covenants, which costs shall become a lien against the property as provided for elsewhere herein.

[18] The court asked if that was something the parties could agree to submit on the briefs. They responded, "on the briefs," but there were no briefs in the record specifically addressing the severance issue.

2021, the court issued its order on these motions, including a grant of VPD's motion to sever the counterclaim. However, the order contained no findings, and the court did not specify whether it was severing the claims under Rule 21 or bifurcating them for trial under Rule 42(b). The order merely stated, "Plaintiff's Motion to Sever Claim [119] is granted."

*Testimony from Motions Hearings and Trial*

¶41. The court heard testimony from the parties and witnesses at a hearing on VPD's motion for contempt and at the trial on VPD's petition for injunctive relief for covenant violations. Relevant testimony from these two proceedings included testimony from each side's experts, from Val, Mary, and Philip Marnecheck, as well as newly-added ACC member Jennifer Glass.

*VPD Expert LeBatard*

¶42. During these hearings, VPD called its expert architect, LeBatard, who was employed by a firm that had done extensive renovations to Val's home as well as another structure on her property. LeBatard reviewed the emails and documents submitted by the Marnechecks for the porch project and opined that they were incomplete. LeBatard said there was no accurate site plan, no elevations, no landscaping plans, and no submission of materials to be used. Further, he pointed out that two porches with four posts are shown on the drawing; however, in the photographs submitted, only three posts were built. One cannot tell, he said, the kind or color of the roof. In LeBatard's opinion, although the Marnechecks' porch was similar to Val's porch, Val's was consistent with the colonial style architecture of her home. LeBatard further testified that changing the dormer style without ACC approval violated the

21

covenants. However, on cross-examination, LeBatard agreed that the ACC should tell an applicant about anything that is lacking in the submission, and he agreed that there was no standard adopted by the ACC that required a particular style of dormer.

¶43. LeBatard also testified that he had served on a similar committee and knew the information needed to make an evaluation if a plan met the standard set for that neighborhood. An ACC needs a complete application showing what the party intends to build, the colors, the materials to be used, roof pitches, and vegetation and landscape plans. LeBatard agreed that if the ACC does not understand something, it should ask for more information. LeBatard agreed that there was no specific architectural design required for homes in the subdivision. He stated that the only standard for design in the covenants is the harmony of the external design to the surrounding structures and topography, which is subjective, and that Val's house was a surrounding structure in this case. LeBatard agreed that the covenants required the ACC to have a minimum of three to five members. But, he said, it was not unheard of for there to be only one person reviewing an application.

*Mary Marnecheck*

¶44. Mary testified about the facts of the two projects already recounted above. Mary added that she thought McNally's "cease and desist" email sent prior to the lawsuit meant "until she provided more information," which she did, satisfying every request for information they made. She testified that when McNally asked her to get an architect to draw new plans for the porch, she did not do so because McNally had also told her that the building plans she had submitted to the City should be sufficient. She added that it was not

22

her intent to ignore Val and McNally's requests for information and that she had kept asking for a meeting so she could understand what more they wanted, but they refused, treating her differently from other homeowners. She said the contractor did not want the dormer replaced at all, but she felt it would be held against her if she did not replace it. The contractor designed the dormer, which had Hardie board (not vinyl, as Val had assumed) on the sides, and she sent a copy of the design to her attorney. She did not learn that the design was not sent to VPD until preparing for her deposition.

¶45. Mary testified that they moved the fence forward on their lot to hide the air conditioners, just as the fences of other homes in the subdivision did.[19] She also raised the fence height because other homes in the subdivision had higher fences. She stated that she told her attorney this, and she was not aware that he misunderstood and told VPD that she was not moving the fence. She said she did not seek permission from the court because there was no TRO in effect dealing with fence maintenance. Also, the covenants did not state how the boards of the fence are to run, vertically or horizontally. Mary testified that the contractor put decorative elements on the fence in an effort to cheer her up when she was in Texas having cancer treatments. She also said she removed the gas lanterns on either side of the garage because the glass was broken, and when they tried to repair it, the fixtures broke further. Her plan was to get replacements, but they were so old that she could not find any lanterns of a similar design. Mary agreed that a sliding door was installed in place of a window in April 2021 when she was in the hospital. She also put pavers in her backyard in

---

[19] Photographs of the other homes in the subdivision show that at least two have fences closer to the front of the home.

August 2021 because the yard became so muddy from the air conditioner run-off. Mary stated that the TRO was specific about prohibiting changes to the landscaping *in the common areas* and to trees, but she explained that these pavers were in her yard. In addition, the TROs were temporary, and after consulting with her attorney, she believed they had expired.

¶46. Mary further testified that after the last hearing in chancery court on November 13, 2020, the court instructed the parties to discuss the repairs needed because of the hurricane. Her attorney conferred with VPD's attorney, and it was communicated to her that she could make the repairs needed to the home because she had water intrusion. She was also told that she could make changes, provided she sent everything to her attorney to communicate with VPD. She said the backyard pergolas were not attached to the house, and she and her husband planned to dismantle them when they sold the house.[20]

*ACC Member Jennifer Glass*

¶47. ACC member Jennifer Glass, a subdivision resident and real estate appraiser, testified that she reviewed the work that the Marnechecks did on their home from August 2020 through January 2021, including the work on both the porch and dormer/fence projects. Using photographs entered into evidence, she pointed out the changes in the dormer, fencing, and windows that were removed compared to the different style of windows the Marnechecks installed, as well as the "decorative ornamental-type fencing embellishment" (i.e., a pergola on the fence by the driveway), and the painted entry and spotlight.

¶48. She further stated that the Marnechecks never paused construction, even after the

---

[20] Mary stated that she and her husband planned to sell the house once this case was resolved.

court order. Photographs entered into evidence established that the roof of the porches in the front and the back were metal, and the chimney on the back side of the house was also enclosed in vinyl in violation of the covenants. Glass listed the problems with the design of the dormer and the location and design of the fence. She stated that behind the front fence with a pergola gate, the Marnechecks had also removed a window and installed glass sliding doors and a doggy door. None of this was mentioned in the Marnechecks' request.[21] Glass conceded that there was nothing in the covenants that prohibited a porch on the front of a house or that required the porch to "go with the design of the home." Further, Glass was unaware that the old stone on the Marnechecks' chimney and former dormer was not real stone but, instead, faux stone that broke up and was not reusable. Glass agreed that the new dormer that the Marnechecks built was similar in design to the ones Val had on her house. Glass admitted that the covenants do not specify a particular height for fences and that some homes in the subdivision had six- and even eight-foot fences.

*Architect George Reed*

¶49.    VPD called George Reed, an architect whom the Marnechecks had retained as their expert. Reed testified that the Marnechecks' porch was in harmony with the neighborhood because Val's house had a similar porch and because there was no unifying style to the homes in the neighborhood.[22] The homes had different styles and different roof pitches, and

---

[21] However, Mary later testified that the removal of the window and installation of the glass door were not part of the dormer/fencing project. The fence project was completed in February 2021, and the window was replaced in April 2021.

[22] Reed said that although he had been designated by the Marnechecks to say that the porch was in harmony with the neighborhood, he retracted that testimony when his

some were more brick—"there's not any one element that I think you are going to see common in all of the homes." So he would say that the Marnecheck house with the improvements was in harmony with surrounding structures. Their home, which was built before the covenants and other homes (except Val's), did not have a particular style. It was "eclectic."

¶50. Reed also testified that an elevation sketch is a two-dimensional drawing looking at a building "front face" that gives an idea of the size, shape, and materials of the structure. Reed said the photographs that were taken on October 5 and October 6, 2020, and submitted to the ACC showed what the porch looked like. But Reed admitted that there was no elevation sketch of the back porch ever submitted.

*Contractor John Ruble*

¶51. The Marnechecks called to the stand the contractor on the dormer/fence project, John Ruble. He explained that roofing materials were delivered near the end of December, and they began removing the old shingles and looking at the dormer. He found that the flashing around the dormer had rotted, and when he crawled into the attic, he discovered more rotten wood than he thought. So he proposed removing the dormer and installing a new one, which required removing the faux stone on the dormer. When he did that, the faux stone broke into pieces. He consulted with Mary and decided to put "Hardie board" on it "because the stone was so porous that we felt like that was the problem[, and that] . . . the mortar joint in the stone allowed water to get behind the dormer." They decided to install a dormer like the one

deposition was taken because no other home had a porch like the Marnechecks. But at trial, Reed changed his opinion yet again.

26

across the street. He had first recommended not replacing the dormer at all, but Mary insisted.

¶52. Regarding the replacement of the fence, Ruble said that he noticed how the first house on the street had a fence that came roughly to the front of the house, so they just moved the Marnechecks' fence to a similar position.

*Developer Felix Bertucci*

¶53. The Marnechecks also called Felix Bertucci, a real estate developer and broker who had developed residential communities in Tampa and in Mississippi and written covenants for three subdivisions. After the court accepted him as an expert, Bertucci viewed photographs of the homes in the Penny Lane subdivision. He described the three homes coming into the subdivision, including Val's house and the Marnecheck home as similar in style. Houses down the street were more similar to each other. He testified to the unique features of each home. He opined that the Marnecheck home was in harmony with the neighborhood, which to him meant that it blended in, was not offensive, and was "warm, attractive, and inviting." Bertucci pointed out that he does not compare houses element by element, for example, asking whether other houses have porches. Rather, "harmony is the overall aspect of that house in relation to the other houses in the neighborhood."

¶54. Bertucci testified that an "elevation" was a drawing, rendering, or a picture of a building. He said that a hand drawing can be an elevation. He also said that the photograph of the porch and the drawing of the dormer that the Marnechecks submitted could "absolutely" be considered elevations. Bertucci looked at the plans that Mary supplied for

27

the porch project and said those provided an elevation of the project.

*Philip Marnecheck*

¶55. Philip Marnecheck testified that during the projects at issue, he was still living in Ohio and practicing law. During a Labor Day visit in 2020, he was on a call with Mary and McNally concerning the porch project. He said McNally threatened a lawsuit, saying that the court would require them to tear down the porch and pay his attorney's fees. Philip did not think this was reasonable and asked McNally and Val to visit with them so they could review the project and get Val's approval. McNally said he would talk to Val and see. Later, McNally emailed that there would be no meeting. Philip said that his wife and Val had a very friendly and cordial relationship prior to this time. They had even taken Val, her father, and Val's brother out to dinner to show their appreciation for Val's help in Mary's move.

*Val Mueller*

¶56. Val testified that there was no formal application for a homeowner to complete to initiate the review of a project. Nor were there any written procedures for the review process. She agreed that she was the only ACC member at the time the Marnechecks began their porch project. Val conceded that the documents of construction plans provided by other homeowners often contained deficiencies, such as no plans for landscaping, no lighting schemes, and no color schemes for bricks. Val was further asked to compare photographs of some finished homes with their plans, and she admitted that the construction deviated from the plans submitted, e.g., one had no chimney, but the plans included a chimney; another had a bay window, but no bay window was in the plans submitted. For another home, which had

28

a swimming pool, Val admitted she had no documents or site plans relating to its construction, although she claimed the pool was discussed when the original plans for the home were approved. She admitted that for prior projects, she met with homeowners about what they wanted to build. But she said that she did not meet with the Marnechecks because she did not have any information, and she did not like to go into a meeting unprepared. Also, the Marnechecks had begun the projects with no prior notice to her. Val felt that the Marnechecks' porch project lessened the value of the home, which she considered as a factor. However, in a proffer, Val was shown two appraisals of the Marnecheck home: one was dated November 30, 2019, and the other was dated December 10, 2020. Val said she was not aware that the home had increased in value.[23]

*Circuit Court's Findings of Fact and Conclusions of Law*

¶57.    On March 2, 2023, the circuit court issued its "Findings of Fact and Conclusions of Law" on the petition for permanent injunction, finding in favor of VPD. The court held that the Marnechecks were not relieved of their responsibility to submit plans to the ACC prior to construction of the porch project, even though the ACC had only one member. Moreover, the Marnechecks had actual knowledge of the covenants prior to beginning their projects. The court found the Marnechecks' submission on the porch project was insufficient and failed to meet the minimum requirements contained in the covenants. Despite the cease and desist request, the Marnechecks continued construction. The court further found that the

---

[23] The court had previously ruled that these appraisals were not relevant to the issue at the hearing and would not admit them. During the proffer, they were marked for identifications. The 2019 valued the home at $350,000; the 2020 appraisal, sets the value at $381,000.

submission on the dormer and fence project was insufficient, and the Marnechecks failed to present plans for the new dormer that they chose to build in an entirely different shape. The remaining projects (changing the windows and adding a sliding glass door) were never submitted to the ACC. The Marnechecks also used prohibited plants in the landscaping, including a palm tree that would grow taller than twelve feet in violation of the covenants.

¶58. The court held that the covenants were binding and enforceable, clear and unambiguous. Moreover, they reasonably delegated authority to the ACC to approve or disapprove plans, and the lack of regulations or construction standards did not render the covenants unreasonable or unenforceable. Nor did the makeup of the committee excuse or waive the requirements the Marnechecks had to submit plans prior to construction. Submission of the required documents triggered the ACC review, during which Val could have appointed the additional members. But the Marnechecks failed to initiate the process, and the thirty-day window for review never began. The court held that Mary admitted she willfully violated the covenants on multiple occasions because she believed the covenants did not apply to her projects. This, the court stated, was not a case of a homeowner mistakenly or negligently violating the covenants. The court held that the proper remedy for violations of the covenants was a mandatory injunction requiring the house to be brought back to the condition it was in on August 24, 2020. In addition, VPD was entitled to recover reasonable attorney's fees. The court's order then required the Marnechecks to specifically dismantle, remove, or restore the porch, the landscaping, the dormer, the fence, and the

windows within ninety days.[24]  Court reserved its ruling on the amount of attorney's fees, giving VPD fourteen days to file its requests with documentation of the work expended on the case and hourly rate.

*Circuit Court's Award of Attorney's Fees*

¶59.    After submissions by VPD's attorneys and objections filed by the Marnechecks, on September 11, 2023, the circuit court issued its "Final Judgment and Order on Attorneys' Fees" on the submissions made by Balch & Bingham LLP, McNally Law, and Lewis "Skip" Negrotto & Associates PLLC.  The court found that VPD was not entitled to all the attorney's fees it requested, and that a charge of $190 per hour for paralegal time was excessive.  The court capped payment for paralegal time at $100 per hour.  The court also found charges for downloading or saving files or other routine office tasks were overhead and should not be assessed to the Marnechecks.  Although the court found the hourly rate for the attorneys was reasonable, the records did not show any reduction for time spent on the counterclaim, and the court found some entries for phone calls were vague.  The court also noted that all the attorneys' bills included "block billing entries," where multiple tasks were grouped together, making it impossible for the court to determine the time spent on any one task.  The court stated that there is nothing wrong with invoicing a client in this manner if the client finds that acceptable.  However, given the difficulty this presented to the court in assessing fees the Marnechecks should pay, the court accepted the Marnechecks' suggestion and reduced McNally and Negrotto's fees by twenty percent and Balch & Bingham's fees

---

[24] The porch project cost the Marnechecks $27,155.37, and the dormer/fence project cost $59,240.00.

31

by ten percent, reasoning the court had already reduced their invoices prior to submitting them to the court. The court awarded a total of $220,939.19 for attorney's fees and expenses, with a breakdown of what each firm would be paid for fees and what they would be paid for expenses.

*Appeal*

¶60. On October 6, 2023, the Marnechecks filed their notice of appeal from the circuit court's "Final Judgment and Order on Attorney's Fees and the Findings of Fact and Conclusions of Law." They raise the following issues on appeal: (1) whether the Marnechecks breached the covenants, (2) whether the court erred in finding VPD had standing to sue, (3) whether the court erred in granting a permanent mandatory injunction, and (4) whether the court abused its discretion in awarding VPD $220,939.19 in attorney's fees and expenses.

**Jurisdiction**

¶61. Before addressing the issues raised by the Marnechecks, we must first determine whether this Court has jurisdiction of the appeal.[25] "An appeal can be taken only from a final judgment." *Bailey v. Wells Fargo Bank N.A.*, 282 So. 3d 482, 487 (¶13) (Miss. Ct. App. 2019). "Generally, an order or judgment is final if it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *In re L.C.*, 394 So. 3d 517, 528 (¶29) (Miss. Ct. App. 2024) (citing *In re M.E.V.*, 120 So. 3d 405, 407 (¶3) (Miss. 2013)). In

_____

[25] "Regardless of whether the parties raise jurisdiction, the Court is required to note its own lack of jurisdiction. Appellate courts must address this question on our own initiative." *Clarksdale Mun. Sch. Dist. Bd. of Trs. v. Montgomery*, 425 So. 3d 520, 524 (¶11) (Miss. Ct. App. 2025) (internal quotation marks and citations omitted).

the case at hand, when the Marnechecks appealed the circuit court's judgment on the issues of the alleged covenant violations and attorney's fees, the circuit court still had the Marnechecks' counterclaim pending before it. Thus, we must determine if the judgments appealed were final and appealable.

¶62. At the outset, we reiterate that trial courts in Mississippi have the power to manage the actions before them, including separating actions, removing claims or defendants from a single action, or separating issues in a single action for disposition in separate proceedings. Jeffrey Jackson et al., *Mississippi Civil Procedure*, §§ 17:1, 17.3 (May 2025 update). This authority is found primarily in Rule 21 of the Mississippi Rules of Civil Procedure, where the court can sever claims or parties and proceed with them separately, and Rule 42(b), where courts can bifurcate claims for trial purposes. *Id.* § 17.3.

¶63. A judgment on a claim bifurcated under Rule 42(b) is considered interlocutory and not appealable unless the court specifically certifies it as a final judgment pursuant to Mississippi Rule of Civil Procedure 54(b).[26] *See Taylor v. Tolbert,* 324 So. 3d 763, 766 (¶13)

---

[26] Rule 54(b) provides:

Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counter-claim, cross-claim, or third-party claim, or when multiple parties are involved, *the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an expressed determination that there is no just reason for delay and upon an expressed direction for the entry of the judgment.* In the absence of such determination and direction, any order or other form of decision, however designated which adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights

(Miss. 2021) (holding that "[w]ithout the entry of a Rule 54(b) certificate, a trial court order which disposes of less than all of the claims against all of the parties in a multiple party or multiple claim action, is interlocutory"). But there is no Mississippi case determining whether and when a judgment on a claim severed under Rule 21 is considered final and appealable. This may be because courts have used the terms "severance" and "bifurcation" interchangeably.[27]

¶64. However, federal courts in Mississippi have dealt with this issue when they have applied Mississippi's Rules 42(b) and 21 to determine whether an allegedly severed claim was properly removed from state to federal court. In one, *Caldwell v. Alfa Insurance Corporation*, 806 F. Supp. 623, 624 (S.D. Miss. 1992), the estate of a deceased person, who was killed in an automobile accident sued the other driver for negligence and the insurance company for bad faith handling of the claim in a single proceeding in the Claiborne County Circuit Court. The state court "severed" the claims "for trial purposes." *Id*. The insurance company removed bad faith claim pled against it to federal court, and the estate moved to

and liabilities of all the parties.

M.R.C.P. 54(b) (emphasis added).

[27] *See Kiddy v. Lipscomb*, 628 So. 2d 1355, 1356 (Miss. 1993) (motions filed to bifurcate claims resulted in court order "severing" the cases); *Bartley-Rice v. State Farm Mut. Auto Ins. Co.*, 172 So. 3d 1227, 1228 (¶6) (Miss. Ct. App. 2014) (same). Also, in *Jennings v. McCelleis*, 987 So. 2d 1041, 1043 (¶7) (Miss. Ct. App. 2008), when considering the appeal of a judgment on a "severed" claim, we noted that the judgment gave no indication that it was meant to be a final, appealable judgment of one claim to the exclusion of the another claim still pending. Therefore, we held that the appealed judgment required the Rule 54(b) certifying language for it to be considered a final judgment for appeal purposes.

remand, arguing that the state court had merely bifurcated the claims for trial purposes under Mississippi Rule of Civil Procedure Rule 42, rather than severing them under Rule 21. *Id.* The insurance company responded that the state court had severed the claims under Rule 21, thereby separating the claims and giving the federal court jurisdiction over plaintiff's claim against it under 28 U.S.C. § 1441(c).[28] The district court began its analysis by noting the distinction between Mississippi's Rule 42 and Rule 21, stating:

> Rule 42(b) of the Mississippi Rules of Civil Procedure provides that a state court judge, in furtherance of convenience or to avoid prejudice, may order a separate trial of any claim before the court. Rule 21 of the Mississippi Rules of Civil Procedure provides that any claim against a party may be severed and proceeded with separately, thus creating entirely independent actions to be tried, and judgment entered thereon, independently.

*Id.* at 624. The federal court noted that the removing party had the burden of establishing that the state court did, in fact, intend to sever the plaintiff's claims rather than merely allow for separate court trials on the separate claims. *Id.* at 625. The court further noted that although bifurcation and severance are clear in theory, "the distinction . . . is often obscured in practice [because] at times the courts talk of a 'separate trial' and a 'severance'

---

[28] This statute provides in part:

(1) If a civil action includes--
> (A) a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and
> (B) a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute,

the entire action may be removed if the action would be removable without the inclusion of the claim described in subparagraph (B).

28 U.S.C. § 1441(c).

interchangeably." *Id.* The district court agreed with the Fourth Circuit's holding in *Compagnie France Film v. Vertex Ltd.*, 782 F. 2d 1034, 4 Fed. Rules Serv. 3d 864 (4th Cir. 1985) (unpublished), in applying Rules 42(b) and 21 of the Federal Rules of Civil Procedure, and the district court quoted the opinion, finding that the "[u]se of the word 'severed' is insufficient, in itself, to establish a Rule 21 severance, given a widely-recognized looseness in usage of the language." *Caldwell*, 806 F. Supp. at 625. Ultimately, the *Caldwell* court determined that the removing party failed to demonstrate that the state court intended to sever the claims completely, rather than merely bifurcate claims for trial, and remanded the case to state court. *Id.*

¶65. Another Mississippi federal court case that discusses Mississippi Rules 42 and 21, *Miller v. Fulton*, 113 F. Supp. 2d 1035 (S.D. Miss. 2000), is factually similar to *Caldwell.* There, an automobile accident victim filed suit in the Hinds County Circuit Court against the other driver for negligence and against the insurance company for bad faith in handling the claim. *Id*. at 1036. When the state court severed the claims, the insurance company removed the case, claiming that the federal court now had diversity jurisdiction over the case against it. *Id*. In considering the accident victim's motion to remand the case to state court, the federal court found that "it [was] less than apparent" that the state court's order actually granted a severance as opposed to merely ordering separate trials under Rule 42(b). *Id*. at 1039. The federal court noted that in their state court motion to sever, the defendants asked for relief under Rule 42(b) and did not mention Rule 21. *Id.* Further, the state court continued to docket all claims together under one cause number, which led the federal court

36

to conclude "that the state court used the term 'severed' in a less than precise way." *Id*. The federal court ultimately held that the insurance company had failed to establish that the state court intended to sever the claims under Rule 21, as opposed to merely ordering separate trials under Rule 42(b), and remanded. *Id.*

¶66.    These federal cases applying the Mississippi Rules of Civil Procedure indicate that a claim that is severed under Rule 21 results in a separate, independent, and final judgment as to that claim.  Further, to determine whether a claim has been severed under Rule 21, these cases look to the record to determine whether the court intended to try the severed claim separately as an independent action, resulting in a final appealable judgment, or whether the court intended to merely bifurcate the parties' claims.

¶67.    In applying similar rules in the Federal Rules of Civil Procedure, federal appellate courts have also sought to ascertain the trial court's intent to determine whether claims have been bifurcated or severed under Federal Rules 21 and 42(b).[29]  For example, in *United*

---

[29]  Compare Federal Rule of Civil Procedure 21:

Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. *The court may also sever any claim against a party.* (Emphasis added).

with Mississippi Rule of Civil Procedure 21:

Misjoinder of parties is not a ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. *Any claim against a party may be severed and proceeded with separately.* (Emphasis added).

Also compare Federal Rule of Civil Procedure 42(b):

*States v. O'Neil*, 709 F. 2d 361, 365 (5th Cir. 1983), the U.S. Department of Agriculture filed several suits against participants in a cotton price support program to recoup overpayment. Four suits were referred to as the "O'Neil" cases, and seven other suits were referred to as the "Batson" cases. *Id.* The program participants counterclaimed for the government's action in barring them from future government loans. *Id.* The parties in all the suits (plaintiffs and defendants) moved for summary judgment on their respective claims. *Id.* The district court found in favor of the program participants on the government's claims and stated in the judgment that the participants' counterclaims were severed from the government's claims and would be tried separately. *Id.* The government timely appealed the order in the Batson cases. *Id.* When no appeal was taken in the O'Neil cases, the district court proceeded to rule in favor of the participants' counterclaims against the government. *Id.* The trial court said that because the cases were severed, the counterclaims were no longer a part of the same suit. *Id.* The government then filed a Rule 60 motion for relief from the

---

(b) Separate Trials. For convenience, to avoid prejudice, or to expedite and economize, *the court may order a separate trial of one or more separate issues*, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial. (Emphasis added).

with Mississippi Rule of Civil Procedure 42(b):

(b) Separate Trial. *The court,* in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, *may order a separate trial of any claim,* cross-claim, counter-claim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counter-claims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by Section 31 of the Mississippi Constitution of 1890. (Emphasis added).

original judgment, alleging that it had a good faith belief that the judgment was not final because of the pending counterclaim. *Id.* The district court denied the Rule 60(b) motion, and the government appealed. *Id*. The Fifth Circuit noted:

> As stated, each of the district court's April 3, 1981 judgments in the original four O'Neil cases contained the following sentence: "The defendants' counterclaim against the plaintiff is severed from the cause of action alleged by plaintiff and will be tried separately and at a later date." By its terms this order "severed" the appellees' counterclaims from the government's "cause of action," which clearly suggests that the district court was invoking Rule 21. Courts and commentators have noted that "sever" and "severance" are sometimes used to denote the separation of trials under Fed. R. Civ. P. 42(b), which confuses the important differences between the effects of Rule 21 and Rule 42(b). However, the fact that the court's order "severed" the appellees' counterclaims "from the cause of action alleged by plaintiff" should have eliminated such confusion because the language used does more than order a separate trial. "The defendants' counterclaim is severed . . . and will be tried separately and at a later date."

*Id*. at 366 (emphasis added) (citation omitted). The Fifth Circuit also noted that in its later order granting summary judgment to the program participants on their counterclaims, the district court clarified its intent that the earlier summary judgment order be construed as a severance of the counterclaims under Rule 21. *Id.*

¶68.    In the case at hand, although the motion VPD filed was titled "Amended Motion to Advance Trial, *to Sever Claims*, and Waiver of Right to Jury Trial," VPD requested that the claims either be severed under Rule 21 *or* bifurcated under Rule 42(b) of the Mississippi Rules of Civil Procedure. The circuit court's order on VPD's motion did not specify which rule it used but simply referred to the pleading docket number and stated, "Plaintiff's Motion to Sever Claim [119] is granted." However, the case proceeded under the initial and only case number.

39

¶69. After a three-day trial on the covenant-violations issue, the court entered its "Findings of Fact and Conclusions of Law," in which it found that the Marnechecks had violated the covenants and ordered them to bring the home back to pre-construction condition. The court also awarded VPD attorney's fees. Thereafter, the court issued a "Final Judgment and Order on Attorney's Fees," which did not contain the Rule 54(b) certification language, i.e., "that there is no just reason for delay and upon an expressed direction for the entry of the judgment." But at the end of the judgment, the circuit court stated, "It is further ordered that the Clerk shall enroll this Judgment in accordance with Miss. Code § 11-7-189 and close this file." Mississippi Code Annotated section 11-7-189(1) (Rev. 2019) provides in part:

> The clerk of the circuit court shall procure and keep in his office one or more books to be styled "The Judgment Roll,". . . . The clerk shall, within twenty (20) days after the adjournment of each term of court, enroll *all final judgments* rendered at that term in the order in which they were entered on the minutes by entering on The Judgment Roll, under the proper letter or letters of the alphabet, the name of each and every defendant to such judgment. . . .

(Emphasis added). Later, *after* the Marnechecks appealed, and while the appeal was pending, the circuit court considered and granted VPD's motion for summary judgment on the Marnechecks' counterclaim. In a footnote in that opinion, the court stated:

> The claim and counterclaim were severed. There is a pending appeal from the trial of the claim, *Mary O'Neill-Marnecheck v. Val's Property Development*, LLC, 2023-CA-01110-COA.

¶70. Considering these facts in light of the cited precedent, we find that the circuit court intended to sever VPD's covenant-violations claim from the Marnechecks' counterclaim under Rule 21 and create entirely separate actions that the court tried and entered independent final judgments upon. Evidence of the circuit court's intent to sever rather than

bifurcate the claims includes its order granting the "motion to sever" using the word "sever"; its order in the final judgment on the covenant violation and attorney's fees claims that the judgment being enrolled as a *final judgment* and the *case closed*, and the court's clarifying in its later order on the Marnechecks' counterclaim that it had *severed* VPD's claim, and that separate judgment on that claim was pending on appeal. We also note that the covenants-violation claim and the home-sale counterclaim involve completely different facts and at a motions hearing in September 2022, the parties agreed that the sale of the house to the Marnechecks was not an issue at the injunction trial. Thus, we find that the court clearly intended to sever the claims under Rule 21, leading to independent, final, and appealable judgments on each. Accordingly, we hold that the Final Judgment and Order on Attorney's Fees resolving VPD's covenant violations and attorney's fees claims was final and appealable, giving this Court jurisdiction.[30]

**Standard of Review**

¶71.    Turning to the standard of review of the substantive issues that the Marnechecks raise, we have held that "[r]estrictive covenants are subject to the rules of contract construction." *Diamondhead Country Club & Prop. Owners Ass'n Inc. v. Comm. for Contractual Covenants Compliance Inc.*, 298 So. 3d 421, 426 (¶19) (Miss. Ct. App. 2020). The Mississippi Supreme Court has held that questions concerning the construction and interpretation of contracts are questions of law, which are reviewed de novo. *Lake Serene*

---

[30] It would assist this Court in the future for trial courts to be more explicit about the Rule they are applying in severing or bifurcating claims, as well as clearly stating their intent as to the finality of the judgments they render on the claims adjudicated.

41

*Prop. Owners Ass'n Inc. v. Esplin*, 334 So. 3d 1139, 1142 (¶6) (Miss. 2022) (internal quotation marks omitted) (quoting *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 751 (¶4) (Miss. 2003)).

¶72. However, the Mississippi Supreme Court had held that appellate courts review the trial court's findings of fact in actions determining the enforcement of restrictive covenants under the manifest error and substantial evidence standard." *Smith v. Brockway*, 396 So. 3d 1108, 1111 (¶12) (Miss. 2024) (citing *Misita v. Conn*, 138 So. 3d 138, 141 (¶7) (Miss. 2014)). We must accept the evidence that supports the court's findings of fact along with all reasonable inferences that can be drawn from that evidence that favors the court's finding. *Simmons v. Jackson County*, 357 So. 3d 1129, 1133 (¶12) (Miss. Ct. App. 2022). We "will not disturb a circuit court's fact findings after a bench trial unless they are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (¶20) (Miss. 2023). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*.

## Discussion

### I. Whether the Marnechecks breached the covenants.

¶73. The circuit court held that the Marnechecks breached the covenants by constructing the porch before submitting plans to the ACC, by deviating from plans submitted to the ACC on the dormer/fence project, or by failing to submit any plans for other work done (laying pavers in their backyard, converting a window to a sliding door, and repairing windows).

The arguments of the parties focus on the validity and enforceability of the covenant provisions concerning the approval of construction projects, the proper constitution of the ACC, and the reasonableness of the ACC's actions.

¶74.    A restrictive covenant is defined as "a private agreement . . . that restricts the use or occupancy of real property, especially by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put." *Diamondhead Country Club & Prop. Owners' Ass'n Inc. v. Comm. for Contractual Covenants Compliance Inc.*, 296 So. 3d 651, 654 (¶11) & n.1 (Miss. 2020) (quoting Restrictive Covenant, *Black's Law Dictionary* (11th ed. 2019)).   The covenant provision in this case that requires ACC approval of exterior improvements to homes in the subdivision is a restrictive covenant.

¶75.    Restrictive covenants are subject to the rules of contract construction. *Belager-Price v. Lingle*, 28 So. 3d 706, 711 (¶¶8-10) (Miss. Ct. App. 2010).  "[W]hen a contract is clear and unambiguous on its face, its construction is a matter of law, and not fact, and must be construed and enforced as written." *Diamondhead Country Club*, 298 So. 3d at 427 (¶19). A contract is ambiguous when it "can be interpreted as having two or more reasonable meanings." *Ward v. Cranford*, 365 So. 3d 308, 317 (¶30) (Miss. Ct. App. 2021); *Austin v. Carpenter*, 3 So. 3d 147, 150 (¶14) (Miss. Ct. App. 2009).

¶76.    If the language of a provision is ambiguous, "this Court utilizes a three-tiered approach to contract construction, and the legal purpose and intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence." *Belager-Price*, 28 So. 3d at 711 (¶8).  The court first uses the "four

corners" test to examine the language the parties used to express their agreement. *Id*.

Second, "only if the contract is unclear or ambiguous can the court go outside the 'four

corners'" of the contract to determine the parties' intent." *Id*. at (¶9). Then the court uses

"discretionary cannons of contract construction" such as construing any ambiguities against

the party that drafted it. *Id*. at (¶10). Finally, "if a clear meaning still cannot be determined

after applying the discretionary canons of contract construction, then the court can consider

extrinsic or parol evidence." *Id*.

¶77. In addition, restrictive covenants are strictly construed. *Robertson v. Catalanotto*, 205

So. 3d 666, 673 (¶22) (Miss. Ct. App. 2016). "Courts generally disfavor restrictive

covenants, so the Court views their construction more strongly against the person seeking the

restriction and in favor of the person being restricted when there is ambiguity." *Smith*, 396

So. 3d at 1111 (¶14). Moreover, the application of restrictive covenants, even when clear

and unambiguous, are assessed with a "test of reasonableness." *Perry v. Bridgetown Cnty.*

*Ass'n Inc*., 486 So. 2d 1230, 1234 (Miss. 1986) (quoting *Hidden Harbour Ests, Inc. v.*

*Norman*, 309 So. 2d 180, 182 (4th Dist. Ct. Fla. App. 1975)). Covenants that are clear and

unambiguous can be enforced if they are reasonable. *Diamondhead County Club*, 298 So.

3d at 421 (¶21). Finally, covenants must be reasonably applied as well. *Berlin v. Livingston*

*Prop. Owners Ass'n Inc*., 232 So. 3d 148, 156 (¶22) (Miss. Ct. App. 2017).

¶78. The Mississippi Supreme Court has held that "[a]n association may, by covenant,

require preapproval of all planned construction and alterations, and it may delegate its power

to approve or disapprove such plans to a neighborhood architectural review committee."

*Goode v. Vill. of Woodgreen Homeowners Ass'n*, 662 So. 2d 1064, 1074-75 (Miss. 1995). In *Berlin*, 232 So. 3d at 156 (¶23), we cited *Goode* and held further that courts may also determine whether an architectural review committee reasonably applied the authority granted to it. In that case concerning the construction of a fence over a drainage easement, we held that "the only issue for judicial determination is whether LPOA and the ARC acted unreasonably when they decided that the fences would interfere with use of the easement." *Id*.

¶79. In light of this precedent, in the case at hand, the covenant provision requiring pre-construction submission and approval by an ACC in general was enforceable. However, that does not resolve the issue of the enforceability of the provision in these particular facts, namely, when the ACC at the time of submission did not have the required minimum number of members. Also at issue, apart from the language of the covenants, is whether the ACC here acted reasonably in its enforcement.

*Breach of Covenant Concerning Submission of Porch Plans to the ACC*

¶80. The restrictive covenant provision at issue, Article IV, Section 1 concerning the submission process reads as follows:

> *No building, . . . nor shall any exterior* addition to or change or *alteration therein be made . . . until* two (2) copies of the plans and specifications for the proposed project *shall have been submitted and approved in writing . . . by* [*an*] *Architectural Control Committee composed of at least three (3) and not more than (5) representatives appointed as herein provided.*

(Emphasis added). Article IV, Section 2 specifically named the first three members of the ACC (Val, Glenn, and Mihalik) and then provided that Mihalik shall be removed if he

45

stopped constructing homes in the subdivision. The circuit court ruled that the provision was clear and unambiguous. However, in paraphrasing it, the court left out important language. The court stated:

> The requirements that specific information be submitted to the ACC, and that the ACC approve the submission prior to the start of any project that is an addition, change or alteration to the exterior of the house, are clear and unambiguous.

The court left out the provision's description of the ACC that would review submissions, namely, an ACC *composed of at least three (3) and not more than (5) representatives appointed as herein provided*. We agree with the circuit court that the covenant provision's language is clear and unambiguous, but it should be read and applied in its entirety, namely as prohibiting construction until a submission is made to and approved by an ACC composed of at least three members.

¶81. Both parties argue that Article IV, Section 1 includes a condition precedent. A condition precedent is a "condition which must be fulfilled before the duty to perform an existing contract arises." *Austin*, 3 So. 3d at 149 (¶12) (quoting *Turnbough v. Steere Broad. Corp.*, 681 So. 2d 1325, 1327 (Miss. 1996)). The Mississippi Supreme Court used this principle to determine the outcome in *Smith v. Brockway*, 396 So. 3d 1108 (Miss. 2024), a restrictive covenant case. There, the Smiths sought injunctive and declaratory relief against the Brockways for installing a mobile home on their property in violation of the subdivision's restrictive covenants. *Id*. at 1109 (¶1). The chancery court denied the Smiths relief, finding that a condition precedent, i.e., that the covenants be signed and dated, had not been met. *Id*. On appeal the Mississippi Supreme Court affirmed, stating that "[t]he plain language of the

46

restrictive covenants read together required the original grantor to date and sign the restrictions to trigger their enforceability, and Steed[, the grantor,] failed to sign them." *Id*. at 1111 (¶13).

¶82.  There being no Mississippi cases directly on point to support their position that an ACC of three must be in place before submission is required, the Marnechecks cite cases from other jurisdictions where courts have held that a homeowner had no obligation to submit plans to an architectural control committee when the committee had not been properly constituted.  However, in those cases, the ACCs were never formed at all.  For example, in *Broman v. Enfield*, 337 P.3d 71 (Kan. Ct. App. 2014) (unpublished)*,* although the developer of the subdivision filed use restrictions and vested the authority to enforce them in a committee selected by a majority of the lot owners, *id*. at *1, the committee was never formed prior to Enfield's cutting trees to create an entryway courtyard on her property.  *Id*. at *3.  Similarly in *Stuart v. Chawney,* 560 N.W.2d 336, 340 (Mich. 1997),[31] also cited by

---

[31] In that case, Gerald Shannon developed a subdivision, Lincoln Green, in 1967 with restrictive covenants and in which the homes were built in traditional colonial style. *Id*. at 336-37.  In 1987, property adjacent to Lincoln Green was developed by Donald Smith with the express agreement that lots there would be subject to the same covenants as those controlling Lincoln Green.  *Id*. at 337.  In 1991, when Chawney sought to build a contemporary-styled home, with a flat roof and rounded corners, Smith directed him to the Nottingham Forest Homeowners' Improvement Association, which had jurisdiction over the twelve lots in Lincoln Green.  *Id*. at 338.  Chawney submitted plans to Patricia Burch, whom Smith said was the appropriate contact with the Nottingham Forest association.  *Id*.  She and Smith approved the plans, and Chawney began to build.  *Id*.  A group of Lincoln Green homeowners sued to enjoin the construction.  *Id*. at 339.  After a three-day bench trial, the circuit   court  found  for  Chawney  because,  among  other  things,  neither  the  suing homeowners  nor the other subdivision lot owners ever constituted the necessary ACC.  *Id*. The Michigan Supreme Court noted that from the time the restrictions were recorded in 1967 to the beginning of the construction of Chawney's home in 1991, no ACC separate from the developer had met to consider proposed construction.  *Id*. at 340.  The Court held:

47

the Marnechecks, the ACC was never formed or operational.[32]

¶83.    In the case at hand, however, the Penny Lanes ACC was formed and members designated in the Covenant provision itself in 2012.  VPD submitted affidavits of homeowners who confirmed that the ACC met with them between 2012 and 2019 to approve their plans.  The ACC functioned until two members resigned—the first (Glenn Mueller) in 2019 and then Mihalik in January 2020.  Thus, the evidence in the record establishes that the ACC here did exist and had functioned for years with three and then two members.[33] Accordingly, we agree with the circuit court that the Marnechecks were required to submit their projects to the ACC for approval prior to construction, even if the committee had only one member.

¶84.    However, the record also establishes that within days of beginning construction, when only a concrete slab for the porch had been poured, on August 27, 2020, the Marnechecks sent their contractor's plans, which clearly stated that it was a "site plan," to Val and later to

---

> Where the defendants complied with all government regulations and objective criteria under the agreement, and the entity charged with determining compliance with other standards did not exist, there was no violation to redress, on an individual basis or otherwise.

*Id*. at 341.

[32] The Marnechecks also cite *Makar v Mimosa Bay Homeowners Ass'n*, 824 S.E. 2d 924 (N.C. App. 2019) (unpublished), which, however, is an unpublished opinion and does not constitute controlling legal authority under Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure 30(e)(3).

[33] Only a vote of a majority of the ACC was needed to do business.

McNally.[34] On August 28, 2020, Mary also sent a detailed description of the porch addition, including the materials to be used (cement, wood, vinyl trim, and roof) and colors (gray cement, white trim, and roof). She indicated that no light or landscaping was needed for the project. McNally responded that the plans were deficient in two areas: there was no external elevation, and the plans were not legible,[35] but he added that the plans submitted to the City to get the permit should be acceptable. On September 3, 2020, in the "Mailbox Drop," the Marnechecks provided legible copies of the plans they submitted to the City. And on September 9, 2020, they sent a photograph of the porch, which their expert testified was the equivalent of an elevation. In essence, contrary to the circuit court's finding that the Marnechecks had not made a "proper" submission,[36] the Marnechecks submitted everything needed to construct the project, substantially complying with the covenant provision within two weeks of beginning construction.[37] "Substantial performance is not literal, full or exact performance in every slight or unimportant detail, but performance of all important

---

[34] Mary testified that they began construction because she knew there was no three-member ACC from her prior review of the covenants and discussions with Val. When Val requested information, Mary immediately provided her with her builder's plans.

[35] Initially, Mary sent a photograph of the plans; she later submitted copies.

[36] There is nothing in the covenants defining a "proper" submission. Although Article IV, Section 1 lists what is to be included, Val testified that the ACC has considered plans that were not complete.

[37] Article IV, Section 1 required "the site plan, floor plan, exterior elevations of all pending structures or alterations, plans for materials, color schemes, lighting schemes, plans for landscaping and other details that may affect the exterior appearance of the structure." Here, the site plan showed where the porches were to be located, Mary provided the materials to be used and the color scheme, and indicated that no landscaping or lighting was needed for the project. The photograph showed the elevation.

49

particulars[.]" *Hardin v. Beaman*, 49 So. 2d 732, 733 (Miss. 1951). Substantial compliance with a covenant requirement has been found sufficient in other contexts. *See City of Gulfport v. Wilson*, 603 So. 2d 295, 399 (Miss. 1992) (holding that although an amendment to a restrictive covenant required a vote of subdivision members, circulating a petition among them constituted substantial compliance with the procedure).

¶85.    In essence, contrary to the circuit court's finding, when the Marnechecks submitted the photograph of the porch showing the elevation, the Marnechecks had submitted substantially everything the Covenants required and cured their breach.[38] This Court, citing the Mississippi Supreme Court, has held that "a party who has breached or failed to properly perform a contract has a responsibility and a right to cure the breach. The non-breaching party must give him a reasonable opportunity to cure the breach." *Byrd Bros. LLC v. Herring*, 861 So. 2d 1070, 1073 (¶15) (Miss. Ct. App. 2003) (citations omitted) (citing *Fitzner Pontiac-Buick-Cadillac Inc. v. Smith*, 523 So. 2d 324, 328 (Miss. 1988)); *see also Winters v. Feng*, 320 So. 3d 1235, 1243 (¶21) (Miss. Ct. App. 2020). In this case, the Marnechecks cured their breach of beginning construction without submission and approval by the ACC when they submitted plans that substantially complied with the covenants. Moreover, even if the submission was deficient in some way, Val testified that in the past, the ACC has approved plans that were not complete or met with homeowners to discuss them. Here, Val did nothing after the Marnechecks made their submission. She did not

---

[38] Although the Marnechecks did not submit the type of the material of the roof of the porches, by the time of the photograph submitted on September 9, 2020, it was clear to all that the roof was metal.

50

communicate any further with them after September 9, 2020, and she did not appoint additional members to the ACC to review the submission. Hearing nothing further, the Marnechecks continued construction, which after thirty days of submission, was approved by default.

¶86. In addition, when the covenants were written, the list of documents required for a submission anticipated primarily new home construction. It is undisputed that the ACC had never considered a home improvement project or determined the extent of plans needed for the committee to make a decision on such a project. Restrictive covenants are to be applied reasonably, and it is only reasonable that a home improvement project plan prepared by a builder may not be as extensive as a new construction plan drafted by an architect. The sufficiency of the submission, then, became a committee decision—a committee with at least three members. Thus, when Mary submitted materials on the project, Val had a covenant obligation to appoint new members so the ACC could decide if the plans were sufficient and then approve or disapprove them. Even the report of the later-constituted committee reflects that the committee retroactively reviewed the materials submitted by the Marnechecks "for completeness," showing that the sufficiency of a submission was a committee function, not for the unilateral decision of one member.[39]

---

[39] In fact, Val should have already added members to the committee in the spring of 2020 before the Marnecheck submission. As of January 2020, Val was the only ACC member. In his affidavit, homeowner Elias stated that before he built his home on Lot 26 *in May 2020*, he met with Val [only] to review his plans, which Elias then thought "were approved by the ACC." Mihalik, who resigned in January 2020, said he did not have anything to do with the plans for Lot 26. Therefore, the record shows that there was at least one submission in 2020 after Mihalik resigned. Thus, Val should have reconstituted the committee before the Marnechecks' project.

¶87. Finally, we have held that an architectural review committee must act reasonably when exercising its approval authority. *Berlin*, 232 So. 3d at 156 (¶22). The record establishes that the ACC had previously routinely met with homeowners to discuss their submissions. Even VPD's expert, LeBatard, admitted that it was incumbent on the ACC to tell the submitter what was lacking or what was needed. In this case, Val and McNally deviated from this reasonable practice and refused to meet with the Marnechecks. In addition, VPD's attorney initially told the Marnechecks that what they had submitted to the City for their permit should be sufficient.[40] But when Mary submitted a photograph of those, he told her that the plans were not legible and needed information on the elevation. When Mary submitted hard copies of the plans, McNally then told her that they may need to hire an architect to design plans, when it is undisputed that the covenants do not require architectural drawings. Neither McNally nor Val had ever dealt with the approval of a home improvement project to know what kinds of plans were sufficient. Here, reason and good judgment mandated the reconstitution of the ACC to make a determination of what plans were actually sufficient for the project and whether the Marnechecks' submission was sufficient. Instead, Val or McNally unilaterally and arbitrarily rejected what the Marnechecks submitted and refused to meet with them as the ACC had with other homeowners, which was not reasonable.[41]

---

[40] McNally also knowingly and erroneously told Mary that the ACC was fully constituted and included Val, Glenn, and Galloway.

[41] During such discussions, Val, McNally, or preferably the re-constituted three-man ACC could have clarified that the metal roof and vinyl siding on the chimneys were clearly prohibited by the covenants, and resolved these issues that the ACC and the court later found

¶88.    While a submission may be *presented* to any individual ACC member, the covenants

clearly and unambiguously required that the materials be "*submitted and approved . . .* by

Architectural Control Committee composed of at least three (3) and not more than (5)

representatives appointed as herein provided." Our Supreme Court has held that if a contract

is unambiguous, then it must be enforced as written." *4-Way Elec. Servs. LLC v. Huntcole*

*LLC*, 366 So. 3d 844, 850 (¶29) (Miss. 2023). "The intentions of the parties, *as shown by*

*the agreement*, governs and is determined by a fair interpretation of the entire text of the

covenant." *Smith*, 396 So. 3d at 1111 (¶14) (emphasis added). The unambiguous language

in the covenant provision here reflects the intent of the declarant that the ACC function with

a minimum of three members in reviewing submissions and approving construction plans.[42]

In this case, VPD was just as bound by the covenants as were the Marnechecks, and no one

member could act unilaterally and arbitrarily to determine the sufficiency of the plans

submitted.

¶89.    Even if the Marnechecks began construction without submission and approval, strictly

construing the covenant provision, an ACC of three members failed to review and approve

or disapprove the submission the Marnechecks did make within the thirty days the covenants

required. Article IV, Section 1 clearly and unambiguously stated that if there was no action

problematic.

[42] Even if the covenant provision was considered ambiguous with regard to whether the ACC was required to have more than one member to decide the sufficiency of a submission, any such ambiguity must be construed in favor of the Marnechecks and against VPD. *Misita*, 138 So. 3d at 142 (¶10) (Restrictive covenants "are subject more or less to a strict construction and in the case of ambiguity, construction is usually most strongly against the person seeking the restriction and in favor of the person being restricted.").

53

by the ACC within thirty days of a submission of materials reasonably requested, the project may proceed:

> In the event said committee fails to approve or disapprove such design or changes and location within thirty (30) days after payment of applicable fees and submission of all information and materials reasonably requested, approval will not be required and this Article will be deemed to have been fully complied with.

By September 9, 2020, the Marnechecks had provided everything that was requested on the porch project in substantial compliance with the provisions in the covenants. Val did not appoint additional ACC members to consider the submission until November 6, 2020, a week before the preliminary injunction hearing, which was after the thirty days had expired. Thus, because a fully constituted ACC did not review or decide on the porch submission within thirty days, the Marnechecks were allowed under the covenants to proceed with the construction.

¶90. In summary, although there is some evidence in the record to support the circuit court's findings that the Marnechecks had not complied with the covenants concerning the porch project, i.e., that the Marnechecks started construction prior to submission and approval of the ACC, the record in its entirety shows that they cured that breach by submitting their plans. VPD did not comply with its obligation to fully constitute the ACC to review the sufficiency and content of that submission or otherwise enforce the covenant provision reasonably. In addition, the Marnechecks' plans, whether complete or incomplete, were not submitted to a three-person ACC within the time required by the covenants. Under the covenants, then, the Marnechecks were deemed to have complied with the covenants.

54

Thus, viewing the entirety of the record, we are left with the definite and firm conviction that the circuit court was manifestly wrong in holding that the Marnechecks had breached the covenants with respect to the porch project. Accordingly, we reverse the circuit court's judgment on that issue and render the injunctive relief order concerning the porch project vacated.

*Breach of Covenants Concerning the Dormer/Fence Project*

¶91. To argue that they did not violate the covenants concerning their dormer and fence project and other work, the Marnechecks again challenge the validity of the ACC's constitution, but for a different reason. They contend that there was never any properly constituted ACC because Val, acting as VPD, the declarant of the covenants, and not as the remaining ACC member, appointed the new members in November 2020, when VPD had no authority to do so under the covenants. Thus, the Marnechecks argue that any deviation from the plans that they did submit to the ACC through their attorney on the dormer/fence or other work is not relevant if the ACC considering them was never properly constituted under the covenant provisions dealing with replacing members.

¶92. Article IV, Section 1 required the ACC to be composed of at least three and not more than five members. At issue is the meaning and application of Article IV, Section 2 concerning the filling of vacancies on the ACC, which provided:

> The initial Architectural Control Committee shall be composed of Glenn Mueller, Valerie Mueller, and Jim Mihalik. In the event Jim Mihalik ceases to construct homes in the subdivision, the remaining architectural review committee members may remove Jim Mihalik from said committee. Otherwise said members shall serve until they die or resign from said office. *Upon the death or resignation of a member or members of the committee, the remaining member or members shall have full authority to designate successor*

55

*members. The Declarant shall have the authority to appoint committee members in addition to the three (3) original members at Declarant's sole option.* At any time after the closing of the sale of all of the lots or building sites by Declarant in the Subdivision and upon the death and/or resignation of the original members, the Board shall have the authority to appoint a committee of at least three (3) and not more than five (5) representatives to exercise the powers, duties and responsibilities hereinabove set forth.

(Emphasis added). Here, it is uncontested that VPD, as the declarant, and not Val as an ACC member, chose the November 2020 replacement members of the ACC. In its findings of fact, the circuit court found that "[n]othing in the covenants requires that replacements for the three (3) original member must be made before [the] Declarant is allowed to appoint members." Although the circuit court did not specifically classify the provision as ambiguous or unambiguous, the court ruled that it meant that the declarant at any time could appoint additional members to the ACC up to a maximum of five. The Marnechecks, however, contend that this covenant provision was ambiguous because it is susceptible to different reasonable interpretations and should then be construed against VPD and in favor of the Marnechecks.

¶93. We have held that the construction and interpretation of contracts are questions of law, including whether a contract is ambiguous. *Ward*, 365 So. 3d at 315 (¶18). "An ambiguity is defined as a susceptibility to two reasonable interpretations." *Dalton v. Cellular S. Inc.*, 20 So. 3d 1227, 1232 (¶10) (Miss. 2009) (quoting *Amer. Guar. & Liab. Ins. Co. v. 1906 Co.*, 129 F.3d 802, 811-12 (5th Cir. 1997)). "An 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or

56

business." *Epperson v. SOUTHBANK*, 93 So. 3d 10, 19 (¶26) (Miss. 2012) (quoting *Dalton*, 20 So. 3d at 1232 (¶10)). "The mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Cypress Springs LLC v. Charles Donald Pulpwood Inc.*, 161 So. 3d 1100, 1104 (¶15) (Miss. Ct. App. 2015). However, the disagreement must be based on the language itself being reasonably susceptible to multiple meanings, not merely on the parties' differing preferences or understandings. "Where the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party." *Epperson*, 93 So. 3d at 17 (¶19).

¶94.    In the case at hand, Article VI, Section 2 concerning the replacement of ACC board members is susceptible to different meanings. For example: "*Upon the death or resignation of a member or members of the committee, the remaining member or members shall have full authority to designate successor members*" could mean that if one or two ACC members resign or die, the remaining ACC member or members are required to fill the vacancy. The Marnechecks claim that this provision means "only" remaining members had authority to fill vacancies and that the language, "*The Declarant shall have the authority to appoint committee members in addition to the three (3) original members at Declarant's sole option*" limited VPD's authority to only appointing the original three members, adding two, at its sole discretion, to expand a three-person committee to five, or to fill vacancies if there were no remaining ACC to do so. Alternatively, this provision could also mean that an ACC member or members had the authority and responsibility of filling any vacancy of the committee, but that the Declarant, at its option, could also name new members up to five because its

57

authority was not limited to simply naming the original three members. Both interpretations are reasonable, making this provision ambiguous. *Miss. Farm Bureau Cas. Ins. v. Britt*, 826 So. 2d 1261, 1265 (¶14) (Miss. 2002) (holding that if contract language is susceptible to two or more reasonable interpretations, then ambiguity is present).

¶95.   However, when a contract provision is ambiguous, it is not our role on appeal to resolve the ambiguity and determine the parties' intent. *Ward*, 365 So. 3d at 315 (¶20) ("If the contract is ambiguous, the subsequent interpretation presents a question of fact for the trier of fact."). In *Epperson*, when this Court found a contract ambiguous and proceeded to interpret it ourselves, the Mississippi Supreme Court reversed, holding: "If the Court of Appeals found the contract to be ambiguous, the matter should have been remanded to the trial court. Contractual ambiguities are questions to be determined by the trier of fact." *Epperson*, 93 So. 3d at 18 (¶22).

¶96.   In this case, the circuit court found as fact that "[n]othing in the covenants requires that replacements for the three (3) original members must be made before the Declarant is allowed to appoint members." Thus, the circuit court did consider and resolve the meaning of this covenant provision. "If the terms of a contract are subject to more than one reasonable interpretation, their meaning presents a question of fact for the fact-finder." *Colbert v. Colbert,* 403 So. 3d 729, 734 (¶22) (Miss. Ct. App. 2025). Our review, then, is limited. "If a contract is determined to be ambiguous, the trial court's judgment is reviewed on appeal under a substantial evidence/manifest error standard." *Lake Serene Prop. Owners Ass'n Inc. v. Esplin*, 334 So. 3d 1139, 1142 (¶6) (Miss. 2022). "Under this standard, we must

affirm unless the [trial court] applied an incorrect legal standard or made manifestly wrong or clearly erroneous factual findings." *Page v. Graves*, 283 So. 3d 269, 274 (¶22) (Miss. Ct. App. 2019).

¶97. We also remember that "when 'construing restrictive covenants, the question is primarily one of intention, and the fundamental rule is that the intention of the parties as shown by the agreement governs, being determined by a fair interpretation of the entire text of the covenant.'" *Belager-Price*, 28 So. 3d at 714 (¶24) (quoting *A.A. Home Imp. Co. v Hide-A-Way Lake Club Inc.*, 393 So. 2d 1333, 1336 (Miss. 1981)). Moreover, "[t]he language of restrictive covenants is to be read 'in its ordinary sense,' considering the entire document as well as the circumstances surrounding its formulation to ascertain its meaning, purpose and intents." *Misita*, 138 So. 3d at 142 (¶10). Applying these principles to the facts of this case, we find that the circuit court's determination that both VPD and remaining ACC members could fill vacancies was a fair interpretation of the covenant language. We find no facts or law that would warrant a reversal of circuit court's choice of interpretation. Accordingly, we find the Marnechecks' argument that the ACC that considered their dormer and fence submission was improperly constituted lacks merit. Because the Marnechecks raise no other challenge to the circuit court's findings, we affirm the circuit court's ruling that they violated the covenants concerning the dormer, fence, and other improvements.

## II. Whether VPD had standing to sue for covenant violations.

¶98. The Marnechecks argue VPD did not have standing to file suit because Article IV, Section 3 authorizes only the board of the HOA to bring legal action if a homeowner begins construction without ACC approval. VPD responds that Article VII, Section 1 of the

59

covenants gave VPD authority to sue for covenant violations as well. The circuit court held that VPD had standing and we agree.

¶99. The Marnechecks rely on Article IV, Section 3, which provided:

> In the event of a violation of these covenants; or the commencement of construction of a plan that had not been rejected by the committee or a plan or change not submitted to the committee, the Board shall be empowered to bring any legal action in law or in equity, to seek [an] injunction preventing such violation, or seeking its removal entirely, or both, at the expense of the owner.

Clearly this provision authorized the board of the HOA to file suit when construction is begun without approval. However, Article VII, Section 1 authorized the declarant to file suit for covenant violations as well, stating:

> The Association, the Board, the Declarant or any Owner, shall have the right to enforce, by any proceeding in law or in equity all restrictions, conditions, covenants, reservations, liens and charges now or hereafter imposed by the provisions of this Declaration.

¶100. Contracts are to be read as a whole in order to give effect to all provisions. *Trustmark Nat'l Bank v. Enlightened Props. LLC*, 330 So. 3d 772, 778 (¶9) (Miss. Ct. App. 2021); *Henry v. Moore*, 9 So. 3d 1146, 1153 (¶17) (Miss. Ct. App. 2008). "Particular words should not control; rather, the entire instrument should be examined." *Cypress Springs LLC*, 161 So. 3d at 1104 (¶16). In the case at hand, reading the covenants in their entirety, it is clear that under Article VII, Section 1, VPD as the declarant had the authority to file suit against the Marnechecks, and we find Marnechecks' argument to the contrary unfounded.

### III. Whether the circuit erred in granting injunctive relief.

¶101. The circuit court ordered the Marnechecks to bring their home "back to the condition it was on August 24, 2020." In essence, the court ordered the Marnechecks to dismantle all

the work done on projects (the porch, the dormer/roof/fence, the additional window and paver projects). The Marnechecks argue that the circuit court failed to consider all elements required under Rule 65 of the Mississippi Rules of Civil Procedure when it ordered them to restore their home to its preconstruction state. VPD counters that the court's mandatory injunction was appropriate, given the violations of the covenants that were proven.

¶102. The Marnechecks argue the injunction requirements of Rule 65 at length, citing a case where a landowner had sued to permanently enjoin a city from demolishing any of the property owner's buildings. *A-1 Pallett Co v. City of Jackson*, 40 So. 3d 563 (Miss. 2010). In that case, the Mississippi Supreme Court noted the elements needed to be proven under Rule 65 for a temporary injunction to be issued:

(1) There exists a substantial likelihood that plaintiff will prevail on the merits;
(2) The injunction is necessary to prevent irreparable injury;
(3) Threatened injury to the plaintiffs outweighs the harm an injunction might do to the defendants; and
(4) Entry of a preliminary injunction is consistent with the public interest.

*Id*. at 568-69 (¶19). The Supreme Court further held that "for a permanent injunction to issue, the above-mentioned factors are weighed in light of all proffered evidence and following a full hearing on the merits of the claim." *Id*. at 569 (¶20).

¶103. However, a case where a plaintiff faces potential harm if certain conduct is not enjoined is different from a case where a plaintiff seeks specific performance as a remedy for violation of a contracted duty. For example, in *Swarek v. Derr Plantation Inc*., 227 So. 3d 903, 904-04 (¶2) (Miss. 2017), the parties entered into a lease-purchase agreement for 8,355 acres of Delta farmland. Swarek appealed the chancery court's determination that

61

there was no binding contract between the parties and the court's refusal of Swarek's request for specific performance that Derr be ordered to honor the contract. *Id*. at 908 (¶¶31-32). The Mississippi Supreme Court held that "[w]hile specific performance is an appropriate remedy in matters relating to real property, it is not a matter of right in Mississippi, but is a matter of grace. *Id.* at 908-09 (¶34) (citing *Roberts v. Spence*, 209 So.2d 623, 625 (Miss. 1968)). The Court held that an application for specific performance is left to the chancery court's sound discretion, "controlled and regulated by established equitable principles." *Id*. The Court made no mention made of Rule 65 in its opinion.

¶104. In this case, VPD filed a petition for injunctive relief, alleging the Marnechecks' breach of the covenants and seeking that the Marnechecks be enjoined from further construction until approved by the ACC. More relevant, then, is the case of *Sullivan v. Kolb*, 742 So. 2d 771, 778 (¶21) (Miss. Ct. App. 1999), where the trial court held that Sullivan had violated unambiguous covenants in erecting a cover over his motor home too close to the property line and then issued an injunction requiring Sullivan to remove it. *Id*. at 774 (¶9). In affirming the injunction on appeal, we noted that the issuance of an injunction was within the trial court's discretion. *Id*. at 778 (¶22). We did not apply the injunction criteria in Rule 65, but rather, we stated:

> In *Hall v. Wood*, 443 So. 2d 834, 841 (Miss. 1983), the Mississippi Supreme Court emphasized that a mandatory injunction is an equitable remedy. It must be customized to meet the needs of the situation. *Id*. It must be clear so that the party enjoined knows what he is expected to do or to refrain from doing. *Id*. It must be practical, in that the party being enjoined is capable of compliance without undue hardship and reasonably likely to achieve the desired end. *Id*.

*Id*. at (¶21). *Sullivan*, then, establishes the acceptable scope of injunctive relief when

fashioned by the court as a remedy, namely, the injunction must be customized to meet the needs of the situation, namely, it must be clear in its directive, it must be practical in that the person enjoined can comply without undue hardship, and it must be reasonably likely to achieve the desired end.

¶105. In *Heidkamper v. Odom*, 880 So. 2d 362, 355 (¶15) (Miss. Ct. App. 2004), we noted the difference between a prohibitory and a mandatory injunction, namely, "[a] prohibitory injunction simply prohibits certain conduct, while a mandatory injunction requires an affirmative act or course of conduct." In that case, Heidkamper had built a pond on his property that caused flooding on adjacent owners' land. *Id*. at 364 (¶2). The trial court found for Heidkamper's neighbors and ordered that Heidkamper lower the level of his pond, install two additional drains and repair fences that had been damaged. *Id*. at (¶7). Quoting *Hall*, we stated, "A mandatory injunction should be ordered where such is the only effective remedy." *Id*. at 367 (¶27). After applying the *Hall* and *Sullivan* factors, we found no abuse of the court's discretion and allowed the injunction to stand. *Id*. at (¶21).

¶106. Applying the *Sullivan* factors in this case, we hold that circuit court abused its discretion in ordering such a sweeping injunction that required the Marnechecks demolish over $80,000 of work performed on their home. From our review of the record, the circuit court's injunction is not customized to meet the needs of the situation. In this case, the court had the benefit of the ACC's resolutions, which reflected their findings of covenant violations in the porch and dormer/fence projects, that the court could use to narrow the mandate. Concerning the porch project, however, we need not examine the ACC findings because we have already found that VPD has not prevailed on that issue, and we have

63

vacated the circuit court's injunction on that work. In its resolution containing its finding on the dormer/fence project, the ACC was concerned about the location and height of the fence. However, there was no height limitation in the fence provision of the covenants, and the proof showed that other homes had fencing that went up to eight feet, making the disapproval of the Marnechecks' six-foot fence proposal arbitrary and unreasonable. The proof also showed that because other homes in the subdivision had fences that were flush with the front of the home, it would be inequitable to make the Marnechecks tear theirs down. Further, the ACC wanted the dormer removed because the new design was not provided to them. However, the proof showed that the style of the Marnechecks' dormer was the same as Val's. If the Marnechecks were made to remove theirs, then Val's dormer was non-conforming and should be removed as well. Although the ACC initially objected to the shingle color, prior to trial, VPD withdrew this objection so making the Marnechecks remove the roof should never have been ordered. The Marnechecks did, however, redesign the gate on part of their fence, positioning the boards horizontally instead of vertically and adding a pergola, which had not been approved. Given these facts, a total demolition of all the dormer/fence work was not needed to meet the needs of the situation. Nor was it practical in that the persons enjoined (the Marnechecks) would incur considerable expense in removing and replacing the entire dormer/fence and other projects, when limited changes would reasonably achieve the desired end—compliance with the covenants.

¶107. Concerning the other projects that the Marnechecks undertook (replacing windows, laying pavers in their backyard, and converting a window to a sliding door), we have no guidance from the ACC because these projects were not submitted by the Marnechecks.

64

Considering the potential cost and hardship to the Marnechecks, we remand to the circuit court to consider ordering that these projects be submitted to the ACC, who should meet with the Marnechecks to determine what, if anything, can be approved and what needs to be replaced.

¶108. Accordingly, we render the circuit court's injunction order vacated and remand for the entry of an order consistent with this holding.

### IV. Whether the circuit court abused its discretion in its award of attorney's fees.

¶109. Because the covenants authorized the payment of attorney's fees if a homeowner was found to have violated the covenants, the circuit court awarded VPD $229,939.19 in attorney's fees. The Marnechecks disagree that they violated the covenants, thus they argue they should not be required to pay any fees at all. In the alternative, the Marnechecks agree with the circuit court's reduction of the fees requested but argue the circuit court did not go far enough.

¶110. In this case, Article VII, Section 1 of the covenants provided:

> In the event a court of competent jurisdiction shall determine that any lot owner shall have violated or have attempted to violate any of the covenants herein, the owner of the lot . . . . shall pay all attorney's fees, court costs, and other necessary expenses incurred by the Person instituting such legal proceeding to maintain and enforce the aforesaid covenants.

"The propriety and quantum of attorney's fees is committed to the sound discretion of the awarding judge and must be supported by credible evidence." *Theobald v. Nosser*, 784 So. 2d 142, 146 (¶13) (Miss. 2001). However, "[a] covenant provision to pay attorney's fees is not a blank check; it is limited by the reasonableness of the fee, which includes an analysis

of whether work performed was actually necessary." *Berlin*, 232 So. 3d at 159 (¶33).

¶111. In the case at hand, in light of our reversal of the court's finding that the Marnechecks had violated the covenants with respect to the porch project, we reverse the award and remand the issue of attorney's fees for reconsideration. Where an appellate court reverses an issue that materially affects the fee award's reasonableness or the basis for it, remand becomes necessary. *McGovern v. McGovern*, 372 So. 3d 138, 149 (¶45) (Miss. Ct. App. 2023). Accordingly, we reverse the circuit court's award of attorney's fees and remand for reconsideration pursuant to the holdings in this opinion upon submission of revised attorney's fees petitions.

## Conclusion

¶112. We affirm the circuit court's ruling that VPD had standing to file suit and its finding that the Marnechecks had violated the covenants with respect to the dormer/fence and subsequent projects.

¶113. Although the Marnechecks violated the subdivision's covenants when they began constructing a porch project prior to submitting plans to VPD's ACC, they cured their breach by submitting the plans they had. VPD failed to properly constitute the three-member committee needed to determine the sufficiency of the submission and approve or disapprove the project within the time required by the covenants. Accordingly, the circuit court erred in finding that the Marnechecks had violated the covenants with respect to the porch project, and we render judgment in favor of the Marnechecks on that issue.

¶114. We render the circuit court's mandatory injunction that the porch project work be torn down vacated. We further reverse the court's mandatory injunction requiring the

66

Marnechecks restore the home to its condition on August 24, 2020, which would include tearing down the dormer, fence, and other work projects, and we remand for the court to revise the injunction order consistent with our holdings.

¶115. Finally, because we hold that the Marnechecks did not violate the restrictive covenants concerning the porch project, we reverse the circuit court's award of attorney's fees and remand for it to reconsider revised fee petitions.

¶116. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., LAWRENCE, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., AND WEDDLE, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**